Exhibit A

03/18/2011  12:24   5413425213                    LAW OFFICE OF JSS                        PAGE  02/03

1 | Jeffrey S. Salisbury, CSB No. 112033
2 | LAW OFFICE OF JEFFREY S. SALISBURY
   | 4725 Village Plaza Loop, Suite 200
3 | Eugene, Oregon 97401
   | Telephone: (541) 345-7007
4 | Facsimile: (541) 342-5213
   | E-mail: salisburylaw@comcast.net

F I L E D

MAR 21 2011

H. DAVIS, CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA
by _____
A. NUESTRO

5 | Attorney for Petitioner

6
7 |              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
8 |                       FOR THE COUNTY OF CONTRA COSTA

9 | In the Matter of:                          )     N11-0457
10 | EDWIN E. "MIKE" LICKISS,                   )  No. _____
                                               )
11 |                        Petitioner,         )  NOTICE OF PETITION AND PETITION
                                               )  FOR EXPUNGMENT OF PUBLIC FINRA
12 | And of:                                    )  RECORDS OF EDWIN E. "MIKE" LICKISS
                                               )
13 | FINANCIAL INDUSTRY REGULATORY              )  Date:   4-26-11
14 | AUTHORITY, INC.,                           )  Time:   9:00 AM
                                               )  Dept.:
15 |                        Interested Party.   )        9
                                               )
16 |                                                            BY FAX
17
18 | TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

19 |        Please take notice that, on ____April 26____, 2011, at ___9___ a.m./p.m. in

20 | Department ___9___ of the above captioned Court, located at 725 Court Street, Martinez, California

21 | 94553, Edwin E. "Mike" Lickiss ("Petitioner") will and hereby does petition the Court for an order

22 | directing expungement of all of his public records held within the Central Registration Depository

23 | ("CRD") operated by the Financial Industry Regulatory Authority ("FINRA") relative to all customer

24 | complaints, arbitrations, litigations and enforcement actions reflected thereon.

25 |        This Court has jurisdiction of this Petition for Expungement pursuant to (1) FINRA Rule 2080

26 | (a); (2) the Court's equitable and inherent powers to effectuate expungements.  Venue is proper here

27 | because all of the events giving rise to the material sought to be expunged occurred here.  The petition

28 | is grounded upon the facts that (1) the material requested to be expunged occurred anciently, i.e., 20 or

NOTICE AND PETITION FOR EXPUNGEMENT OF RECORDS 3/18/2011 12:27:30 PM

rec 3/24/11
(pu)

03/18/2011  13:25   5413425217        LAW OFFICE OF JSS        PAGE  05/22




1  more years ago, (2) Petitioner's regulatory record has long since been and remained clean, and (3) the

2  material sought to be expunged was overwhelming caused by the failure of a single investment

3  security which Petitioner brokered for nothing more than ordinary commissions and over which

4  Petitioner had no control or influence.  This Petition is based on the following documents submitted

5  herewith:  Notice of Petition and Petition for Expungement, Memorandum of Points and Authorities,

6  Declaration of Edwin E. "Mike" Lickiss, Jeffrey S. Salisbury, and Proposed Order.

7

8

9

10  DATED:  3 | 17 , 2011                    Jeffrey S. Salisbury
                                            JEFFREY S. SALISBURY
11                                          Attorney for Petitioner

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE AND PETITION FOR EXPUNGEMENT NOTICE AND PETITION FOR EXPU/2811 13:03 PM

1    Jeffrey S. Salisbury, OSB No. 97093
    LAW OFFICE OF JEFFREY S. SALISBURY
2    4725 Village Plaza Loop, Suite 200
    Eugene, Oregon 97401
3    Telephone: (541) 345-7007
    Facsimile: (541) 342-5213
4    E-mail: salisburylaw@comcast.net

**F I L E D**

MAR 2 1 2011

SUPERIOR COURT, CLERK OF THE COURT
COUNTY OF CONTRA COSTA, CALIFORNIA

By _____ T. NUESTRO

5    Attorney for Petitioner

6

7             IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
                 FOR THE COUNTY OF CONTRA COSTA

8

9    In the Matter of :                    No. **N11-0457**

10   Edwin E. "Mike" Lickiss             **MEMORANDUM IN SUPPORT OF**
                          **PETITION FOR EXPUNGMENT.**

11                Petitioner,

12   And of :

13   FINANCIAL INDUSTRY REGULATORY
    AUTHORITY, INC.,
14

15               Interested Party.        **BY FAX**

16

17       Petitioner, Edwin E. "Mike" Lickiss, submits this memorandum in support of his petition (the

18   "Petition") to expunge the disclosure events contained in his Central Registration Depository ("CRD")

19   report maintained by the Financial Regulatory Authority ("FINRA") formerly known as the National

20   Association of Securities Dealers ("NASD").

21                     **I. INTRODUCTION**

22       Through this Petition, Mr. Lickiss, a local financial advisor, asks the Court to order that his

23   public securities brokerage records be expunged of any reference to certain customer claims and

24   settlements involving him which date back some twenty years.  The claims were virtually all centered

25   on a single investment that failed for reasons beyond Mr. Lickiss' control but which nevertheless

26   remain as blemishes on his public record.  Far more importantly, the claims are ancient, and his record

27

28   has been clean ever since they were filed.  Under applicable brokerage industry rules, and per the

104N3706318161f - 3/18/2011 1237:49 PM

1  Court's inherent powers, the requested expungement is therefore proper and should be granted for the

2  reasons detailed below.

3  ## II. FACTUAL BACKGROUND

4  Mr. Lickiss' life record is that of a solid citizen who has always tried to do the right thing.

5
6  During the 1970s, he attended Bay Area, California state universities, where he obtained a bachelor's

7  degree in history and a master's degree in deaf education. *See* Declaration of Edwin E. "Mike"

8  Lickiss ("Lickiss Dec.") submitted herewith ¶ 2. He taught within this field throughout Contra Costa

9  County for several years thereafter. *Id.* ¶ 3.

10  In October 1977, Mr. Lickiss determined to make a career change and became licensed to sell

11  investment securities. Lickiss Dec. ¶ 3. He has practiced financial advisory full-time with four

12  different brokerage firms from that time through the present. *Id.* ¶ 7. From 1977 through 1991 – for

13  fourteen consecutive years – his public securities record remained spotless. *Id.* ¶ 8. There were no

14  complaints, no arbitrations, no lawsuits and no criminal or regulatory investigations or enforcement

15  actions.

16
17  That lengthy, pristine record changed abruptly in 1991 when Mr. Lickiss was hit with a bevy

18  of customer arbitration claims. Lickiss Dec. ¶ 20. Virtually all of those claims stemmed from sales he

19  had made years earlier in the common stock of a real estate investment trust ("REIT") by the name of

20  Commonwealth Equity Trust ("CET"). *Id.* ¶¶ 8, 9.

21  Mr. Lickiss first learned of CET in 1986. Lickiss Dec. ¶ 9. This REIT was founded in the

22  mid-1970s by Jeff Berger, Sr. ("Jeff Sr.") and was managed by him for many years. *Id.* ¶¶ 9 -12. His

23  management style was conservative and prudent, as he purchased and operated the apartment

24  complexes, retail centers and office parks held by CET with only modest debt leveraging. *Id.* ¶ 10.

25  The low levels of debt served to reduce the REIT's break-even cash flow point, offering a substantial

26  cushion against negative cash flow risks. *Id.* ¶ 11.

27
28  · CET's conservative orientation also allowed it to maintain dependable financial performance

03/18/2011  12:31  541342521        LAW OFFICE OF JSB        PAGE  04/11

1    for investors. CBT paid consistent stock dividends of approximately 8% per year throughout the 1977

2    to 1991 timeframe. Lickiss Dec. ¶ 12. The REIT's share price also fared well, remaining steady at

3    $10 per share for years, then gradually increasing into the $12 range over time. *Id.* Thus Mr. Lickiss'

4    clients enjoyed the benefits of CBT's prudent policies and solid performance for a considerable period

5    of time, in that he had begun selling shares of it in 1987. *Id.* ¶ 13. By that time, CBT's track record

6
7    had been excellent for approximately 10 straight years. This lengthy tradition of success, coupled

8    with his broker-dealer's own investigative due diligence, provided Mr. Lickiss with comfort in

9    recommending CBT to his clients. *Id.* ¶ 13.

10        He stopped selling CBT at the start of 1991 when he began to grow uneasy with the REIT's

11   increasing use of debt. Lickiss Dec. ¶ 13. The increasing debt levels of CBT tracked the rise in power

12   at CBT of Jeff Sr.'s son, Jeff Berger, Jr. ("Jeff Jr."). *Id.* ¶ 14. Jeff Sr. passed away in or about 1990,

13   at which time Jeff Jr. assumed full control over CBT. *Id.* At the same time Jeff Jr. was increasing

14   CBT's debt leveraging, the California economy – and particularly commercial real estate – began to

15   slump. *Id.* ¶ 15.

16        This double whammy on CBT was compounded by costly, unethical behavior by Jeff Jr.

17
18   Unbeknownst to Mr. Lickiss, or most anyone else for that matter, Jeff Jr. essentially misappropriated

19   $7.2 million in precious cash from CBT at this exigent point in time. Lickiss Dec. ¶ 16. Between the

20   poor California real estate economy, CBT's increased debt load, and Jeff Jr.'s financial "grab", the

21   struggling REIT had no choice but to eliminate its dividend in early 1991. *Id.* ¶ 17. CBT promptly

22   thereafter defaulted on its lines of credit and sought to renegotiate its banking facilities, ultimately to

23   no avail. *Id.*

24        The impact of this on CBT shareholders, including Mr. Lickiss' clients, was highly adverse.

25   CBT's share value declined, and the stock became illiquid. Lickiss Dec. ¶ 17. Lawsuits were filed

26   against Jeff Jr. and his management company, and CBT eventually declared bankruptcy in 1993. *Id.*

27
28   ¶¶ 18, 19. Mr. Lickiss' investors lost the great majority of their investment in CBT. *Id.*

104X370831816.B - 3/18/2011 12:37:49 PM

1    During 1991 through 1996, seventeen of Mr. Lickiss' clients brought arbitration claims against

2    him through FINRA's binding dispute resolution program.[1]  Lickiss Dec. ¶¶ 20, 21.  Most all of the

3    claims centered on his sale of CET stock to them.[2]  Id. ¶.  A chart summarizing the claims is attached

4    to the Lickiss Declaration as Exhibit "C".  The essence of the claims was that Mr. Lickiss failed to

5    disclose the risks of CET and that its shares were thus ill-suited for them.  Id.  There were no

6    allegations of misappropriation, excessive commissions or any other self-dealing or self-benefitting by

7    Mr. Lickiss.  Id.

8    Contrary to the arbitration claims, CET in fact had been an investment carrying conservative to

9    moderate risk, rather than high risk, until Jeff Jr. took over the REIT and essentially drove it into the

10   ground upon his father's death.  Lickiss Dec. ¶ 22.  Those events, as well as the abrupt demise of CET,

11   occurred long ago, i.e., approximately twenty years now.  Id. ¶ 21.

12   The super majority of the arbitration claims were filed against Mr. Lickiss by Richard Sacks.

13   Lickiss Dec. ¶ 23.  He was not at the time, and never has been, an attorney.  Id. ¶ 243.  Mr. Sacks

14   suffered from a deeply checkered history as a stockbroker.  Id. ¶ 25.  He was fined multiple times by

15   FINRA in staggering amounts measuring in the hundreds of thousands of dollars.  Id. ¶¶ 25, 26.  After

16   repeated offenses, and corresponding sanctions, he was permanently barred from the securities

17   industry in 1991, just about the time CET was failing.  Id.

18   Mr. Sacks was determined to lash back at the industry that had defrocked him, and he began by

19   setting up an arbitration investor recovery firm.  Lickiss Dec. ¶ 27.  He sought to represent investors

20   against their financial advisors for percentage-of-recovery fees.  Id.  He specifically targeted Mr.

21   Lickiss' CET sales by obtaining a CET stockholder list and personally soliciting Mr. Lickiss' clients.

---

[1] The FINRA is a self-regulatory organization that falls under the jurisdiction of the Securities and Exchange Commission.  FINRA is comprised of all securities brokerage firms nationwide and is funded and managed by those firms.  It sponsors a binding arbitration program to accommodate claims brought by customers against their brokers.  Participation is mandatory.

[2] The very few claims not identified as CET claims may well have been CET based.  Unfortunately Mr. Lickiss could not recall specifically whether they involved CET stock sales.  Nevertheless, like CET, the

1   *Id*. One by one, he talked many of them into suing Mr. Lickiss in FINRA arbitration. *Id*. Absent Mr.

2   Sacks unethical, and likely illegal, solicitation of Mr. Lickiss' clients, Mr. Lickiss is convinced that

3   they would never have brought the claims against him that are the subject of this Petition. Lickiss

4   Dec. ¶ 28.

5

6   With the exception of the CET sales of 1987 – 1991, and one additional isolated incident

7   involving the sale of a relatively small promissory note investment, essentially all of Mr. Lickiss'

8   personal and professional conduct has been beyond reproach for approximately twenty years.[3]

9   Similarly, Mr. Lickiss' record was completely clean during the fourteen years from 1977 through

10   1991, when Mr. Sacks' onslaught of CET claims commenced. Lickiss Dec. ¶ 32.

11   Despite Mr. Lickiss' professional record remaining free of black marks for so long, the CET

12   arbitration claims have continuously hurt his professional reputation and practice. Lickiss Dec. ¶ 33.

13   With consumers' increasing use of the Internet, his clients and potential clients have observed the

14   many blemishes on his CRD record, year after year, decade after decade. *Id*. He finds it very difficult

15   to explain to these individuals the detailed, complex realities underlying the CET claims, and many

16   times he does not even have that opportunity, such as when potential clients simply decide not to

17   contact him in the first place. *Id*. ¶ 34.

18

19   As a result, Mr. Lickiss consistently has lost numerous client opportunities, causing him

20   financial setbacks measured in the thousands of dollars. *Id*. ¶ 35. On top of the financial losses, he

21   has suffered serious, unquantifiable harm to his reputation in the local community, not only

22

23   claims were based on real estate investment sales that took place approximately twenty years ago.

24   [3] Other than CET, and the few, old real estate sales mentioned in Footnote 2, the only other blemish on
   Mr. Lickiss' CRD report relates to a promissory note sale he made. In late November 1993, he sold a

25   $10,000 note to a client's IRA. Mr. Lickiss derived no personal benefit from this sale other than a
   standard investment sales commission. After the maker of the note defaulted, Mr. Lickiss agreed out of

26   generosity to repay the investor's loss. He did so under intense pressure applied in the moment, when the
   client was supposedly on his deathbed. Time did not permit him to first obtain his broker-dealer's consent

27   to the repayment. Mr. Lickiss settled with FINRA on its allegation of settling a customer claim without
   broker-dealer consent by paying a $8,500 fine. *See* Lickiss Dec. ¶¶ 29 – 31. This isolated incident

28   occurred some seventeen years ago.

MEMORANDUM IN SUPPORT OF PETITION FOR EXPUNGMENT, PAGE 5

1  professionally, but also personally. Id. ¶ 36.

2  ## III. ANALYSIS

3  Under these facts, expungement of Mr. Lickiss' CRD record is entirely appropriate. FINRA

4  rules expressly contemplate, and even require, expungement by a court of competent jurisdiction.

5  Moreover the Court's inherent powers of equity support expungement generally and in this case

6  specifically.

7

8  **A. The Applicable FINRA Rule**
   **Authorizes Expungement by the Court**

9  The by-laws of FIRNA provide that it is to maintain rules and regulations by which its member

10  firms and associated persons such as Mr. Lickiss must abide in order to qualify for ongoing

11  membership and for the privilege of trading securities. FINRA Rule 2080 addresses expungement of a

12  broker's CRD record in relation to customer complaints and FINRA arbitrations. Declaration of

13  Jeffrey S. Salisbury, submitted herewith, Exhibit "A". Rule 2080 is entitled: "Obtaining an Order of

14  Expungement of Customer Dispute Information from the Central Registration Depository (CRD)

15  System". The section of this Rule relevant to the Petition now before the Court reads: "Members or

16  associated persons seeking to expunge information from the CRD system arising from disputes with

17  customers *must obtain an order from a court of competent jurisdiction directing such expungement* or

18  confirming an arbitration award containing expungement relief." FINRA Rule 2080(a) (emphasis

19  added). This Rule therefore conveys jurisdiction to the Court on the Petition, and it does so explicitly.

20

21  **B. This Court has the Equitable Power**
   **to Expunge Petitioner's FINRA Record**

22  It is fundamental that courts hold broad equitable powers to effectuate fairness for all those

23  who come before them, such as Mr. Lickiss herein:

24  > Courts of equity may exercise broad powers in applying equitable
   > principles and enjoy broad discretion in fashioning remedies which
   > balance the interests of affected parties. The propriety of affording
   > equitable relief in a particular case rests in the sound discretion of the
   > trial court to be exercised according to the circumstances and exigencies
   > of the case, and, in deciding to grant equitable relief, the court may

25

26

27

28

104M3768316161.fl1 - 3/18/2011 12:37:49 PM

1    consider a wide range of circumstances and equitable procedures.

2    30A C.J.S., *Equity* § 5 at 1 (May, 2010) (numerous citations omitted), Salisbury Dec., Ex. "B".

3    The Court's powers extend well past basic decision-making into the formulation of any and all

4    appropriate remedies: "Courts of equity are not restricted to issue only known remedies. Rather,

5    courts of equity and their remedies are distinguished for their flexibility, their unlimited variety, their

6

7    adaptability to circumstances and the natural rules which govern their use, and there is in fact no limit

8    to their variety in application. C.J.S., *supra*, at 2, Salisbury Dec. Ex. "B".

9    California courts, and other state courts sitting nationwide, are in accord. "And courts retain

10   the inherent equitable power to relieve a party from the burdens of a judgment, again in an appropriate

11   case. 8 Witkin, Cal. Procedure (4th ed. 1997) *Attack Judgment in Trial Court*, § 214 et seq. at p. 718 et

12   seq." *Gill Petroleum, Inc. v. Hayer*, 137 Cal.App.4th 826, 832, 40 Cal.Rptr.3d 648, 652 (2006).

13   This power has been applied in a wide variety of circumstances in numerous jurisdictions.

14   *See, e.g., Houck v. Darling*, 238 Or. 484 (1964) (grantor entitled to expungement of record of

15   improper real property deed); *Hooton v. Jarman Chevrolet Co., Inc.*, 135 Or. 269 (1930) (court

16   implicitly approves expungement of bill of exceptions in case involving appellate review protocol).

17   Salisbury Dec. Ex. "C" for case authority copies.

18

19   A court's specific inherent power to expunge public records is recognized in numerous, if not

20   all, states. *See State v. Schultz*, 676 N.W.2d 337 (Minn.App. 2004) ("The exercise of a court's

21   inherent power to expunge is a matter of equity...."); *State ex rel. Cline v. Schricker*, 89 N.E.2d 547

22   (Ind.Sup.Ct. 1950) (courts "invested with inherent power to use their appropriate judicial processes to

23   expunge from the range of their judicial observation in an appropriate case any [suitable matter]");

24   *Long v. State*, 2003 WL 21793993 (Minn.App., 2003) ("court has inherent power to expunge if

25   benefits to petitioner outweigh public interest"). *See* Salisbury Dec., Ex. "C".

26   Accordingly here the Court has both the equitable power to consider and grant the

27   expungement relief requested by Mr. Lickiss, as well as the express authorization to do so under

28

MEMORANDUM IN SUPPORT OF PETITION FOR EXPUNGEMENT, PAGE 7

1   FINRA Rule 2080(a).

2   C. **The Equities Favor Expungement**

3       The above authorities generally, and the *Long* case specifically, explain how a request for

4   expungement is to be evaluated. The court is to balance the individual's need for expungement

5   against the need to protect the public interest. *Long, supra* (expungement proper where "benefits to

6

7   petitioner outweigh public interest"). The equities here tip decidedly in favor of granting Mr. Lickiss'

8   request for expungement.

9       The enormous passage of time is the primary fact supporting this petition. Mr. Lickiss sold the

10  subject CET stock shares from 1987 through 1991. That means the purported misconduct occurred

11  some twenty or more years ago. That is a long, long time. Prior to 1987, ten additional years had

12  elapsed between 1977 when he became licensed to sell securities and 1987 when he first began selling

13  CET shares. Thus Mr. Lickiss was clean for a full decade before selling the ill-fated CET shares and

14  for the two decades after selling them.

15      This lengthy passage of time is significant in balancing Mr. Lickiss' need for expungement

16  against protecting the public interest. As to Mr. Lickiss' need, he has been suffering with the

17  reputational damage caused by the CRD disclosures for an extraordinarily long period of time. Year

18  in and year out he has lost clients, been placed in embarrassing positions, and tried to explain complex

19

20  legal and financial matters to people who only know that they saw seventeen black marks on his

21  public record. He should not have to endure those problems any longer. Twenty years is long

22  enough.

23      As to the public interest, there is simply no need to continue the CRD disclosures any further

24  to protect current and potential clients of Mr. Lickiss. The lengthy passage of time without further

25  blemish on his record demonstrates that he is not a threat to the investing public. If he were an

26  ongoing threat of any sort, that is to say if he had not learned any lessons form his 1987-1991 CET

27  sales, he would no doubt have been called-out by investors during the two decades following those

28

104\370831816.ff - 3/18/2011 12:37:49 PM

1   sales. But this has not happened. Instead Mr. Lickiss has quietly maintained an honest, ethical

2   financial sales practice free from offense or complaint throughout this timeframe. Thus the public will

3   not be prejudiced by expungement because it will not be deprived of any information material to a

4   decision to hire him or to continue to use his services.

5         California expungement rules and norms for criminal matters are instructional to this Petition.

6   It is elemental that criminal misconduct is generally deemed to be of a more serious nature than mere

7   civil or tortuous misconduct. Yet misdemeanor criminals, and even some felons, are eligible for

8   expungement of their public records in a much shorter period of time than Mr. Lickiss has already

9   waited for the instant expungement relief. Section 1203.4 of the California Criminal Code permits

10   expungement once the petitioner has fulfilled his probation and paid any associated fines. Most

11   California probations do not last longer than three to five years. *See, e.g.,* California Benchguide 75,

12   *Misdemeanor Sentencing* (2008 ed.), Salisbury Dec. Ex. "D". After this relatively short timeframe,

13   the petitioner is deemed eligible for expungement of his criminal record. At twenty years now, Mr.

14   Lickiss *a fortiori* should be accorded this same privilege.

15   D. Additional Equities Favor Expungement.

16         The Court should consider two additional factors in weighing the equities of expungement

17   here. The first is that CET's abrupt failure was unanticipated and inconsistent with its solid

18   performance track record; hence Mr. Lickiss should not be blamed for it permanently. CET had paid

19   steady dividends, year in and year out, between 1977 when it was founded and 1987 when he began

20   selling it. The REIT used low levels of borrowing throughout this timeframe. Jeff Jr.'s takeover of

21   CRT upon the demise of his father, Jeff Sr., was unforeseeable and abrupt, as was his increase in the

22   debt leverage of CET and hence its risk, as well as his $7.2 million cash "grab". Similarly abrupt and

23   unforeseeable was the major downslide in California commercial real estate occurring at the same

24   time. Those events largely and collectively caused the losses occasioned on Mr. Lickiss' clients as

25   much or more than his own conduct. To the extent Mr. Lickiss sold CET shares or failed to have his

1   clients sell CET shares timely, he has "paid" for his share of the blame for twenty year now.  Equity

2   thus demands that Jeff Jr.'s misconduct and the economic realities at the time be factored into this

3   expungement request.

4        A final equitable consideration here is Mr. Sack's role in fomenting the subject claims against

5   Mr. Lickiss.  We again are not suggesting that Mr. Lickiss should have been allowed to avoid the

6   consequences of his own conduct in selling CET.  But he in fact has not avoided them, having paid out

7   settlements and long experienced a marred public record.  What we are suggesting is that the Court

8   consider that he was targeted by an unethical, non-attorney advocate who likely broke rules or laws to

9   solicit all of Mr. Lickiss' clients to incite them to bring the claims against him.  Hence Mr. Sack's

10  hundreds of thousands of dollars of regulatory fines and his disbarment from the securities industry

11  shed relevant light on the genesis of the claims for which Mr. Lickiss seeks expungement and on the

12  overall equities of the Petition.

13

14                          IV. **CONCLUSION**

15       For all of these reasons, Mr. Lickiss respectfully asks that the Court find that "enough is

16  enough" and that this Petition for expungement be granted accordingly.

17

18

19  _____            ___3|17|11___
    **JEFFREY S. SALISBURY**                        Date
20  Attorney for Petitioner

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF PETITION FOR EXPUNGMENT, PAGE 10

1   Jeffrey S. Salisbury, CSB No. 112033
    LAW OFFICE OF JEFFREY S. SALISBURY
2   4725 Village Plaza Loop, Suite 200
    Eugene, Oregon 97401
3   Telephone:  (541) 345-7007
    Facsimile:  (541) 342-5213
4   E-mail:   salisburylaw@comcast.net

5   Attorney for Petitioner

6              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
7                    FOR THE COUNTY OF CONTRA COSTA

8   In the Matter of:                          No.   N11-0457

9   EDWIN E. "MIKE" LICKISS,

10                          Petitioner,         DECLARATION OF JEFFREY S.
                                                SALISBURY IN SUPPORT OF PETITION
11  And of:                                     TO EXPUNGE FINRA CRD RECORD

12  FINANCIAL INDUSTRY REGULATORY
    AUTHORITY, INC.,
13

14                          Interested Party.            BY FAX

15

16      I, Jeffrey S. Salisbury, declare as follows:

17      1. I am an attorney at law duly licensed to practice in the State of California. I represent the

18  Petitioner in this matter and make this declaration on personal knowledge in support of his petition for

19  expungement submitted herewith. I could and would testify competently to the facts contained in this

20  Declaration if called to do so.

21      2. Attached hereto as Exhibit "A" is a true and correct copy of Financial Industry Regulatory

22  Authority Rule 2080.

23      3. Attached hereto as Exhibit "B" are true and correct copies of excerpts of Corpus Juris

24  Secundum as referenced in the memorandum of points and authorities submitted on this Petition.

25

26      4. Attached hereto as Exhibit "C" are true and correct copies of case opinions printed from

27  WestLaw's online legal research service. The opinions are set forth in alphabetical order.

28      I declare under penalty of perjury under the laws of the State of California that the foregoing is

                    DECLARATION OF JEFFREY S. SALISBURY IN SUPPORT
                    OF PETITION TO EXPUNGE FINRA CRD RECORD, PAGE 1

1  true and correct to the best of my knowledge and belief and that this declaration was executed at

2  Eugene Oregon, on ___3 | 17___, 2011.

3

4                              _Jeffrey S. Salisbury_

5                                   Jeffrey S. Salisbury

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

104M370845329.tif - 3/18/2011 12:59:02 PM



Print

## 2080. Obtaining an Order of Expungement of Customer Dispute Information from the Central Registration Depository (CRD) System

(a) Members or associated persons seeking to expunge information from the CRD system arising from disputes with customers must obtain an order from a court of competent jurisdiction directing such expungement or confirming an arbitration award containing expungement relief.

(b) Members or associated persons petitioning a court for expungement relief or seeking judicial confirmation of an arbitration award containing expungement relief must name FINRA as an additional party and serve FINRA with all appropriate documents unless this requirement is waived pursuant to subparagraph (1) or (2) below.

(1) Upon request, FINRA may waive the obligation to name FINRA as a party if FINRA determines that the expungement relief is based on affirmative judicial or arbitral findings that:

(A) the claim, allegation or information is factually impossible or clearly erroneous;

(B) the registered person was not involved in the alleged investment-related sales practice violation, forgery, theft, misappropriation or conversion of funds; or

(C) the claim, allegation or information is false.

(2) If the expungement relief is based on judicial or arbitral findings other than those described above, FINRA, in its sole discretion and under extraordinary circumstances, also may waive the obligation to name FINRA as a party if it determines that:

(A) the expungement relief and accompanying findings on which it is based are meritorious; and

(B) the expungement would have no material adverse effect on investor protection, the integrity of the CRD system or regulatory requirements.

(c) For purposes of this Rule, the terms "sales practice violation," "investment-related," and "involved" shall have the meanings set forth in the Uniform Application for Securities Industry Registration or Transfer ("Form U4") in effect at the time of issuance of the subject expungement order.

Amended by SR-FINRA-2009-016 eff. Aug. 17, 2009.
Amended by SR-NASD-2003-200 eff. April 12, 2004.
Adopted by SR-NASD-2002-168 eff. April 12, 2004.

Selected Notice: 04-16, 09-33.

©2008 FINRA. All rights reserved.

# EXHIBIT "A"

30A C.J.S. Equity § 5

Corpus Juris Secundum
Database updated May 2010

Equity
Francis C. Amendola, J.D.; Paul M. Coltoff, J.D.; John Glenn, J.D.; and John R. Kennel, J.D., of the
staff of the National Legal Research Group, Inc.

I. General Considerations

Topic Summary  References  Correlation Table

§ 5. Courts of equity—Extent and limitations of power and discretion

West's Key Number Digest

West's Key Number Digest, Courts ⚖42(7)
West's Key Number Digest, Equity ⚖1, 2
Courts of equity may exercise broad powers in applying equitable principles and enjoy broad
discretion in fashioning remedies which balance the interests of affected parties, but the powers of
courts of equity are not unlimited.

  Courts of equity may exercise broad powers in applying equitable principles[FN1] and enjoy broad
discretion in fashioning remedies which balance the interests of affected parties.[FN2] The propriety
of affording equitable relief in a particular case rests in the sound discretion of the trial court to be
exercised according to the circumstances and exigencies of the case,[FN3] and, in deciding to grant
equitable relief, the court may consider a wide range of circumstances and equitable procedures.
[FN4] A court's equitable authority may not be limited absent a clear and valid legislative command.
[FN5] Accordingly, when trial courts are properly acting as courts of equity, they have discretion
unless a statute clearly provides otherwise, and such discretion is displaced only by clear and valid
legislative command.[FN6] The powers of a court of equity, dealing with the subject-matters within its
jurisdiction, are not cribbed or confined by the rigid rules of law,[FN7] and a court of equity has
powers not possessed by a court of law.[FN8] Furthermore, a court of equity is not always restricted
by the same rules as courts of law,[FN9] and the powers of a court sitting in equity are less hampered
by technical difficulties than a court of law.[FN10] Courts may exert equitable powers based upon
common-law, statutory, or constitutional rights, or upon judicial acknowledgment of public-policy
considerations establishing an as-yet-unrecognized legal right.[FN11]

  However, the powers of courts of equity are not unlimited,[FN12] and may not be exercised in
such a manner as to deprive persons of legal right to which they would otherwise be entitled in action
at law,[FN13] including constitutionally or statutorily protected rights.[FN14] A court's decision to
grant equitable relief must be supported by the facts and law,[FN15] and a court of equity cannot
blithely disregard principles of logic concerning what follows from what, any more than a court of law
can.[FN16] A court's exercise of equitable authority is only appropriate when a legally protected right
has been invaded.[FN17] The discretion possessed by a court of equity must not be exercised
arbitrarily, but rather in accordance with fixed principles and precedent of equity jurisprudence.
[FN18] Furthermore, a court of equity has no more right than has a court of law to act on its own
notion of what is right in a particular case and must be guided by the established rules and
precedents,[FN19] and just as for a court of law, a court of equity's failure to follow judicial precedent
may constitute an abuse of discretion or an error of law.[FN20] A judge may not impose conditions or
grant relief which in his or her individual opinion would work substantial justice between the parties
without regard to precedents and established principles.[FN21] In addition, a court cannot sua sponte
exercise its inherent authority to grant equitable relief in a manner that prejudices the opposing party

EXHIBIT "B"

03/18/2011  12:42    5413425219          LAW OFFICE OF JSS                PAGE  06/34

CJS EQUITY § 5                                                            Page 2 of 4

by failing to give it an opportunity to present evidence to oppose the relief ultimately given.[FN22]

*Remedies.*

Courts of equity are not restricted to issue only known remedies.[FN23] Rather, courts of equity and their remedies are distinguished for their flexibility, their unlimited variety, their adaptability to circumstances and the natural rules which govern their use, and there is in fact no limit to their variety in application.[FN24]

---

[FN1] U.S.—Sixty-Seventh Minnesota State Senate v. Beens, 406 U.S. 187, 92 S. Ct. 1477, 32 L. Ed. 2d 1 (1972).
- Cal.—Marvin v. Marvin, 122 Cal. App. 3d 871, 176 Cal. Rptr. 555 (2d Dist. 1981).
- Fla.—Cournand v. Lucor Corp., 114 So. 2d 733 (Fla. Dist. Ct. App. 2d Dist. 1959).
- Me.—Littlefield v. Adler, 676 A.2d 940 (Me. 1996).
- N.M.—Jones v. Schoellkopf, 138 N.M. 477, 2005-NMCA-124, 122 P.3d 844 (Ct. App. 2005).

**Inherent power**

Nev.—Jordan v. State ex rel. Dept. of Motor Vehicles and Public Safety, 121 Nev. 44, 110 P.3d 30 (2005).
N.J.—Ross v. Ross, 35 N.J. Super. 242, 113 A.2d 700 (Ch. Div. 1955).

[FN2] Pa.—East Hempfield Township v. Brubaker, 828 A.2d 1184 (Pa. Commw. Ct. 2003).

[FN3] N.H.—Geiss v. Bourassa, 140 N.H. 629, 670 A.2d 1038 (1996).

[FN4] N.H.—Taber v. Town of Westmoreland, 140 N.H. 613, 670 A.2d 1034 (1996).

[FN5] Wis.—Harvest Savings Bank v. ROI Investments, 228 Wis. 2d 733, 598 N.W.2d 571 (Ct. App. 1999).

[FN6] U.S.—In re Munoz, 287 B.R. 546 (B.A.P. 9th Cir. 2002).

[FN7] Cal.—Hirshfield v. Schwartz, 91 Cal. App. 4th 749, 110 Cal. Rptr. 2d 861 (2d Dist. 2001).

**Flexible power**

Me.—Littlefield v. Adler, 676 A.2d 940 (Me. 1996).

[FN8] U.S.—In re Forman Enterprises, Inc., 281 B.R. 600 (Bankr. W.D. Pa. 2002).

[FN9] Neb.—Strunk v. Chromy-Strunk, 270 Neb. 917, 708 N.W.2d 821 (2006).

[FN10] U.S.—Newbro v. Freed, 409 F. Supp. 2d 386 (S.D. N.Y. 2006), aff'd, 2007 WL



03/18/2011  12:42   5413425218          LAW OFFICE OF JSS          PAGE  07/34

CJS EQUITY § 5                                                    Page 3 of 4

642941 (2d Cir. 2007).

[FN11] Vt.—Titchenal v. Dexter, 166 Vt. 373, 693 A.2d 682 (1997).

[FN12] U.S.—Sixty-Seventh Minnesota State Senate v. Beens, 406 U.S. 187, 92 S. Ct. 1477, 32 L. Ed. 2d 1 (1972); In re Forman Enterprises, Inc., 281 B.R. 600 (Bankr. W.D. Pa. 2002).
- Minn.—Claussen v. City of Lauderdale, 681 N.W.2d 722 (Minn. Ct. App. 2004).
- Wis.—First Federated Sav. Bank v. McDonah, 143 Wis. 2d 429, 422 N.W.2d 113 (Ct. App. 1988).

[FN13] U.S.—Barnes v. American Tobacco Co., Inc., 984 F. Supp. 842 (E.D. Pa. 1997), judgment aff'd, 161 F.3d 127, 42 Fed. R. Serv. 3d 865 (3d Cir. 1998).

[FN14] U.S.—Seguros Banvenez, S.A. v. S/S Oliver Drescher, 761 F.2d 855 (2d Cir. 1985).

[FN15] Minn.—Claussen v. City of Lauderdale, 681 N.W.2d 722 (Minn. Ct. App. 2004).

[FN16] U.S.—In re Forman Enterprises, Inc., 281 B.R. 600 (Bankr. W.D. Pa. 2002).

[FN17] Wis.—GMAC Mortg. Corp. v. Glavold, 215 Wis. 2d 459, 572 N.W.2d 466 (1998).

[FN18] N.Y.—Horizon Bank, N.A. v. Siorist, 179 A.D.2d 1020, 579 N.Y.S.2d 279 (4th Dep't 1992).

[FN19] Pa.—East Hempfield Township v. Brubaker, 828 A.2d 1184 (Pa. Commw. Ct. 2003).
- As to effect of absence of precedents on jurisdiction of court to grant equitable relief, see § 13.

[FN20] Pa.—East Hempfield Township v. Brubaker, 828 A.2d 1184 (Pa. Commw. Ct. 2003).

[FN21] Minn.—Claussen v. City of Lauderdale, 681 N.W.2d 722 (Minn. Ct. App. 2004).

[FN22] Minn.—Claussen v. City of Lauderdale, 681 N.W.2d 722 (Minn. Ct. App. 2004).

[FN23] N.J.—Banach v. Cannon, 356 N.J. Super. 342, 812 A.2d 435 (Ch. Div. 2002).

[FN24] N.J.—Banach v. Cannon, 356 N.J. Super. 342, 812 A.2d 435 (Ch. Div. 2002).

CJS EQUITY § 5

Westlaw. © 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

CJS EQUITY § 5

END OF DOCUMENT

(c) 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

293 P. 604
135 Or. 269, 293 P. 604
(Cite as: 135 Or. 269, 293 P. 604)

Page 1

▷
Supreme Court of Oregon.
HOOTON
v.
JARMAN CHEVROLET CO. INC., ET AL.
Dec. 2, 1930.

In Banc.

Appeal from Circuit Court, Coos County; J. T. Brand, Judge.

Action by M. O. Hooton against the Jarman Chevrolet Company, Inc., and another. Judgment for plaintiff, and defendants appeal. Motion to dismiss appeal.

Motion denied.

### West Headnotes

[1] Exceptions, Bill Of 158 ⟐43(1)

158 Exceptions, Bill Of
    158II Settlement, Signing, and Filing
        158k35 Time for Presentation, Allowance, and Filing
            158k43 Presentation and Allowance After Expiration of Time
                158k43(1) k. In General. Most Cited Cases
Settling bill of exceptions almost one year after judgment was abuse of discretion; statute allowing 60 days. ORS 19.100; Const. art. 1, § 10.

[2] Appeal and Error 30 ⟐655(2)

30 Appeal and Error
    30X Record
        30X(J) Defects, Objections, Amendments, and Corrections
            30k652 Amendment in Appellate Court
                30k655 Striking Out
                    30k655(2) k. Bill of Exceptions.

Most Cited Cases
Bill of exceptions not being settled until almost one year after judgment, should be expunged from record. ORS 19.100; Const. art. 1, § 10.

[3] Appeal and Error 30 ⟐555

30 Appeal and Error
    30X Record
        30X(C) Necessity of Bill of Exceptions, Case, or Statement of Facts
            30k555 k. Effect of Striking Out Bill, Case, or Statement. Most Cited Cases
Expunging "bill of exceptions" from record does not necessarily require dismissal of appeal; statute obviating exceptions to matters in writing and on file. ORS 17.510, 19.100.

[4] Appeal and Error 30 ⟐555

30 Appeal and Error
    30X Record
        30X(C) Necessity of Bill of Exceptions, Case, or Statement of Facts
            30k555 k. Effect of Striking Out Bill, Case, or Statement. Most Cited Cases
Expunging bill of exceptions held not to require dismissal of appeal; certified judgment roll containing all proceedings below concerning motion for new trial. ORS 17.510, 19.100.

**604 *269 Leroy Lomax, of Portland, for the motion.

Goss, Murphy & Skipworth, of Marshfield, opposed.

*270 BROWN, J.

Based "upon the record of this cause and wherein it appears that the judgment was entered in the lower court on October 22, 1929, and that no bill of exceptions was tendered to the lower court until on October 17, 1930, and after the argument of this cause before this court," the plaintiff has filed a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT "C"

Case 3:11-cv-01986-EMC   Document 1-1   Filed 04/22/11   Page 22 of 66

293 P. 604
135 Or. 269, 293 P. 604
(Cite as: 135 Or. 269, 293 P, 604)

Page 2

motion to expunge the bill of exceptions, dismiss the appeal, and affirm the judgment appealed from. As set out in the motion, the record discloses that the judgment order herein was entered on October 22, 1929; that no bill of exceptions was tendered until October 17, 1930, and no extension of time was ever granted for filing the same.

In so far as it pertains to the question presented by this motion, section 2–703, Oregon Code, 1930, provides: "A proposed bill of exceptions may be tendered by presenting it to the clerk of the court within sixty (60) days after the entry of the judgment or decree, or within such further time as may be granted by order of the court."

[1][2][3]  This law must be so administered, however, as to harmonize with, and come within the compass of, Oregon Constitution, art. 1, § 10, which announces that "justice shall be administered * * * completely and without delay." Clearly, the trial court abused its discretion in settling and allowing the bill of exceptions nearly a year after the entry of judgment. It came too late, and should be expunged from the record. But, as written by our court, speaking through Mr. Justice Rand in Student v. Goddapp, 124 Or. 102, 259 P. 207, 208: "This, however, will not result as in the Pinck Case [121 Or. 688, 257 P. 19], in the dismissal of the appeal, for with the bill of exceptions expunged the appellant under the record here, may still try out the question of the sufficiency of the pleadings, the correctness of the court's rulings in denying the motion for change of venue and in denying the motion for a new trial and possibly other questions."

*271  This doctrine is well settled in this jurisdiction, and is based upon statute and court decisions. In the early case of Bridal Veil Lumbering Co. v. Johnson, 25 Or. 105, 34 P. 1026, 1027, the question of the necessity for **605 an exception arose, and Mrs. Justice Moore, speaking for the court, said: "No exceptions are required to be taken or allowed to any decision upon a matter of law, when it is entered in the journal, or made wholly upon matters in writing and on file in the court (Hill's Code, §

233)."

This decision is recognized and followed in Chung v. Stephenson, 50 Or. 244, 89 P. 386, 805, 806, where Mr. Justice Eakin, in delivering the opinion of the court, said: "We understand that exceptions are only necessary to be taken to save and bring up errors transpiring upon the trial that cannot be preserved in the record without a bill of exceptions. This error appears from the record, viz., the pleadings and the findings, and does not depend upon the bill of exceptions to disclose it."

In Pullen v. Eugene, 77 Or. 320, 146 P. 822, 824, 147 P. 768, 1191, 151 P. 474, Ann. Cas. 1917D, 933, in passing upon the question of the necessity of presenting error of the trial court by bill of exceptions, the court declared: "Nor was it necessary, when the demurrer was sustained, to save an exception to the court's ruling, since it was made upon a matter in writing and on file in the court. L. O. L. § 172."

In the case of Chrudinsky v. Evans, 85 Or. 548, 167 P. 562, 563, the opinion of the court was delivered by Mr. Justice Burnett. Among other things, the learned justice said:

"The principle error relied upon by the appealing defendant is the entry of a separate judgment on the several verdicts. For one thing, in opposition to this, the plaintiff contends that the defendant cannot be heard here on that point, because there is nothing about it in the bill of exceptions. We read, however, in section 172, L. O. L.:

*272 " 'No exception need be taken or allowed to any decision upon a matter of law, when the same is entered in the journal, or made wholly upon matters in writing and on file in the court.'

"An exception is an objection, and a bill of exceptions is necessary only where the matter to which it applies does not otherwise appear of record. Here, however, the decision complained of was made upon these written verdicts which were filed, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

293 P. 604
135 Or. 269, 293 P. 604
(Cite as: 135 Or. 269, 293 P. 604)

Page 3

was embodied in an entry upon the journal of the court. Hence there was no need of duplicating the history of the transaction impugned."

The question was again presented in Annand v. Austin, 86 Or. 403, 167 P. 1017, 168 P. 725, 726, and the court, in its opinion on rehearing, wrote: "The plaintiff raised the question appropriately by her motion to substitute other findings, and as the decision on that point was made upon matters in writing and on file, it is not necessary that specification of the error should appear in the bill of exceptions. L. O. L. § 172."

In School District No. 30 v. Alameda Construction Co., 87 Or. 132, 169 P. 507, 510, 788, the court in passing upon the question, held: "The error is apparent on the face of the record itself so that no bill of exceptions is required. L. O. L. § 172."

In Emmons v. Southern Pacific Co., 97 Or. 263, 191 P. 333, 345, Mr. Justice Burnett, in discoursing upon this subject, said:

"It presents a case under the second clause of section 172, L. O. L., where it is said:

" 'No exception need be taken or allowed to any decision upon a matter of law, when the same is entered in the journal, or made wholly upon matters in writing and on file in the court.'

*273 "The pleadings are here, the verdict is here, and the judgment is here. The error of entering such a judgment on such a verdict is one of law, made wholly upon written documents on file in the circuit court, and hence is reviewable on appeal on the record thus made."

This clause was quoted and followed in Bailey v. Security Ins. Co., 100 Or. 163, 196 P. 252, and again in Montague-O'Reilly v. Town of Milwaukie, 101 Or. 478, 193 P. 824, 199 P. 605.

In the case of State v. Laundy, 103 Or. 443, page 508, 204 P. 958, 206 P. 290, 292, Mr. Justice Harris, in rendering the opinion for the court, made the following pertinent observation:

"The original importance of one of the two functions of an exception was recognized by section 172, Or. L., where it was and still is provided:

" 'No exception need be taken or allowed to any decision upon a matter of law, when the same is entered in the journal, or made wholly upon matters in writing and on file in the court' —because in the enumerated cases an exception was not necessary for the reason that such 'decision' became a part of the judgment roll, even though no bill of exceptions was prepared."

Continuing his discussion as to the jurisdiction of the court to pass upon particular questions, the justice says: "In this jurisdiction, as in most jurisdictions, the general rule established by court decisions is that only such questions of law as are presented upon an objection, an adverse ruling, and an exception will be reviewed upon an appeal [citing authorities]; but this rule, like many rules, has its exceptions. One exception to this general rule, expressly recognized by the Code, is found where the question of law is one that is involved in a ruling which properly appears in the judgment roll, even though there be no bill of exceptions."

*274 In the case of State v. Karpenter, 120 Or. 90, 250 P. 633, 634, 251 P. 307, 308, the court refused to consider the objection made to the **695 verdict, for the reason that it "was not raised to the court below and is not incorporated in the bill of exceptions." But, on petition for rehearing, that part of the original opinion that had reference to the foregoing objection and the refusal of the court to consider the same was withdrawn by the court "because it is not a proper statement of the law."

A "bill of exceptions" has been aptly defined by this court as "a memorial of matters occurring at the trial of a cause which do not otherwise appear of record." Kublk v. Davis, 76 Or. 501, 147 P. 552. See, also, Hamra v. Alluvial Farm Co., 79 Or. 557, 152 P. 103, 156 P. 265.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

395 P.2d 445
238 Or. 484, 395 P.2d 445
(Cite as: 238 Or. 484, 395 P.2d 445)

Page 1

**C**

Supreme Court of Oregon, Department 1.
Gardner F. HOUCK, also known as Gardner P.
Boyd, Appellant,
v.
Clarence V. DARLING, Grace, H. Davis, Florence
May Nunn, Cecil H. Russell, Ray Hogaboam and
Percy Hogaboam, Respondents.
Argued and Submitted Sept. 14, 1964.
Decided Sept. 23, 1964.

Action to cancel a deed and for a general relief. The
Circuit Court, Multnomah County, Alan F. Davis,
J., entered judgment for defendants and plaintiff ap-
pealed. The Supreme Court Lusk, J., held that even
though evidence was insufficient to support cancel-
lation of the deed on ground of fraud or duress,
grantor was entitled to a decree expunging the re-
cord of the deed where general relief was sought,
and evidence established that the acknowledgment
of grantor's signature on the deed was false in that
grantor did not appear before the notary public who
signed it.

Decree affirmed as modified.

**West Headnotes**

**[1] Cancellation of Instruments 69 €══47**

69 Cancellation of Instruments
   69II Proceedings and Relief
      69k44 Evidence
         69k47 k. Weight and Sufficiency. Most
Cited Cases

**Deeds 120 €══211(3)**

120 Deeds
   120V Evidence
      120k205 Weight and Sufficiency of Evidence
         120k211 Validity
            120k211(3) k. Fraud and Misrepresent-
ation. Most Cited Cases

**Deeds 120 €══211(5)**

120 Deeds
   120V Evidence
      120k205 Weight and Sufficiency of Evidence
         120k211 Validity
            120k211(5) k. Duress. Most Cited
Evidence, in action to cancel a deed to realty, sus-
tained finding that grantor signed the deed freely
and voluntarily, and that the deed had not been ob-
tained by fraud or duress.

**[2] Acknowledgment 12 €══24**

12 Acknowledgment
   12II Taking and Certificate
      12k23 Mode of Taking Acknowledgment
         12k24 k. In General. Most Cited Cases
An acknowledgment on a deed was false where
grantor did not appear before the notary public who
signed it. ORS 93.410, 93.430, 93.480, 93.490.

**[3] Acknowledgment 12 €══4**

12 Acknowledgment
   12I Nature and Necessity
      12k4 k. Instruments to Be Acknowledged or
Proved. Most Cited Cases

**Deeds 120 €══45**

120 Deeds
   120I Requisites and Validity
      120I(C) Execution
         120k45 k. Signature or Subscription. Most
Cited Cases
An acknowledgment of a grantor's signature on a
deed is not essential to validity of the deed as
between the parties, but its purpose is to entitle the
deed to be recorded.

**[4] Deeds 120 €══83**

120 Deeds

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

03/18/2011   12:42   541342621      LAW OFFICE OF JBS

395 P.2d 445
238 Or. 484, 395 P.2d 445
(Cite as: 238 Or. 484, 395 P.2d 445)

Page 2

120II Recording and Registration
    120k83  k. Instruments Entitled to Record.
Most Cited Cases

Records 326 ☞11

326 Records
    326I In General
        326k11  k. Cancellation or Surrender of Re-
cords. Most Cited Cases
A record of a deed bearing a false acknowledgment
should be stricken.

[5] Deeds 120 ☞83

120 Deeds
    120II Recording and Registration
        120k83  k. Instruments Entitled to Record.
Most Cited Cases

Records 326 ☞11

326 Records
    326I In General
        326k11  k. Cancellation or Surrender of Re-
cords. Most Cited Cases
Grantor was entitled to a decree expunging record
of his deed where acknowledgment of his signature
thereon was false in that he never appeared before
the notary public who signed it. ORS 93.410,
93.430, 93.480, 93.490.
*485 **445 Donald H. Joyce, Portland, argued the
cause and filed a brief for appellant.

David H. Fertig, Portland, argued the cause and
filed a brief for respondents.

Before McALLISTER, C. J., and ROSSMAN,
SLOAN, GOODWIN and LUSK, JJ.

LUSK, Justice.

This is a suit to cancel a deed to real property, de-
scribed as follows:

'The West 12 ft. of Lot 4, and the East 30.5 ft. of
the South 1/2 of Lot 5, all in Block 26, Caruthers

Addition to the City of Portland, in the County of
Multnomah, State of Oregon.'

The plaintiff alleged in his amended complaint that
on August 31, 1960, the defendants, acting through
one of them, Cecil H. Russell, 'by fraud, duress and
artifice, obtained an acknowledged and purported
deed of conveyance' to the real property in question
from the plaintiff; that a notary **446 public was
obtained to execute a form of acknowledgment on
the deed, whereas in fact the plaintiff never ac-
knowledged the deed before the notary public, and
that the defendants, acting through Russell, caused
the deed to be placed of record in the deed records
of Multnomah County, Oregon.

The case was put at issue and after trial the court
entered a decree denying the relief sought and de-
claring the deed valid. The plaintiff has appealed.

The plaintiff made his home on the property in
question. The defendants, who are the children of
his second wife (whom he married in June, 1961),
are *496 the grantees in the deed. The deed re-
serves a life estate in the grantor.

[1] No facts constituting fraud, duress or artifice,
are alleged in the amended complaint, and there is
no evidence to support the charge, or that the
plaintiff lacked capacity to make a deed. The
plaintiff signed and delivered the deed freely and
voluntarily, and the court below was right in deny-
ing the relief of cancellation of the deed.

[2][3][4] It is shown, however, without dispute, that
the acknowledgment is false, as the grantor never
appeared before the notary public who signed it.
See ORS 93.410, 93.430 and 93.490. Such an abuse
of the notarial authority is not to be passed by in si-
lence. An acknowledgment is not essential to the
validity of a deed as between the parties ( Williams
v. First National Bank, 48 Or. 571, 576, 87 P. 890;
Manaudas v. Mann, 14 Or. 450, 452, 13 P. 449;
Goodenough v. Warren, 5 Sawy. 494, 498, 10
Fed.Cas. p. 588, No. 5,534; Earle v. Chambers,
CCA 9th, 172 F. 73, 76, 24 L.R.A.N.S., 879); in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

89 N.E.2d 547
228 Ind. 41, 89 N.E.2d 547
(Cite as: 228 Ind. 41, 89 N.E.2d 547)

Page 1

**H**

Supreme Court of Indiana.
STATE OF INDIANA ex rel. Claude CLINE et al.,
Appellants,

v.

Harry F. SCHRICKER, Governor of the State of
Indiana; Charles Francis Fleming, Secretary of
State of the State of Indiana; James M. Propst, Aud-
itor of State of the State of Indiana; F. Shirley Wil-
cox, Treasurer of State of the State of Indiana, Ap-
pellees.
No. 28559.

Jan. 10, 1950.

On rehearing.

Rehearing denied.

For former opinion, see 88 N.E.2d 746.

*42  **547 Appeal from Marion County Superior
Court; John L. Niblack, judge.
Claude Cline, Huntington, for appellant.

*43 J. Emmett McManamon, Indianapolis, for ap-
pellee.

*63 GILKISON, Judge (dissenting).
*64 Appellants have filed a petition for rehearing
herein for many pertinent reasons some of which of
a procedural nature I have answered in a dissenting
opinion heretofore filed. In that opinion I did not
discuss the case on its merits because no issue was
presented to the trial court authorizing it to pass
upon the merits of the case, and no general appear-
ance was entered by appellees. However, my broth-
er judges, entered the gateway of error opened by
the trial court, and attempted to pass upon the mer-
its of the case, and by overruling the petition for re-
hearing have widened the open gateway and en-
hanced the opportunity for error. For this reason I
feel it my duty to enter the forbidden arena and dis-
cuss the case on its merits on the petition for re-

hearing.

There has been and there is nothing before the court
but plaintiff's complaint. All proper averments
therein must be accepted as true, since the decision
is made solely upon the sufficiency of its averments
to state a cause of action. Among other averments
therein I quote grammatical paragraphs 6 and 7 as
follows:

'6. Plaintiff further says that the said General As-
sembly and its duly elected and presiding officers
thereof failed to adjourn its session at the day and
hour as above required by the above referred to pro-
visions of the Constitution of the State of Indiana,
but that the said General Assembly with the full
knowledge of each and all of the defendants herein,
did purposely, fraudulently, flagrantly and design-
edly continue the sessions of both Senate and
House of the said General Assembly until five-
thirteen and five-sixteen P.M. respectively, Central
Standard time on Wednesday March 9, 1949, for a
period of more than forty-one hours after the time
as above set and fixed by the Constitution of the
State of Indiana for the regular and legal adjourn-
ment thereof which prolonged *65 sessions were in
violation of said provisions of said Constitution.
That in an attempt to avoid said provisions and
without constitutional rights so to do, and without
authority of law, the said General Assembly and its
officers stopped the clocks and the time-pieces in
their places of assembly at eleven twenty-two P.M.
on said March 7, 1949, in a silly, foolish and illegal
attempt to avoid the provisions of said Constitution.
That said clocks and time-pieces were continued
stopped at eleven twenty-two P.M. as of the date of
March 7, 1949, until March 9, 1949, as aforesaid.

'7. Plaintiff further says that subsequent to the
hour of midnight on Monday March 7, the said
General Assembly in violation of each and all of
the hereinbefore referred to constitutional provi-
sions, remained in continuous session until the hour
and date aforesaid and falsely, fraudulently, know-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 N.E.2d 547                                                      Page 2
228 Ind. 41, 89 N.E.2d 547
(Cite as: 228 Ind. 41, 89 N.E.2d 547)

ingly, willfully and in utter disregard of said **548 Constitutional provisions, pretended to function as a legal General Assembly of the State of Indiana, after the said date of March 7, 1949. That the presiding officers of each of said Houses accepted and entertained resolutions, motions and bills and that the members of said Houses of said General Assembly voted on each and all of said actions and that a false and pretended record was made of each and all of said actions and that the said presiding officers of each of said Houses of said General Assembly falsely, fraudulently and willfully attested and certified to the genuineness and correctness of the said actions of each of said houses, then and there well knowing that the said actions of said Houses were not taken within the limitation of time so fixed by the provisions of the Constitution of the State of Indiana. That in pursuance of said illegal acts as aforesaid the presiding officers of each of said Houses of the General Assembly permitted the entry in the journal of each of said Houses of a record of each of the actions of said resolutions, motions and bills as made in each of said Houses subsequent to midnight, March 7, 1949. That said presiding officers have certified each of said actions to the Secretary of State in the manner as provided by law, then and there well knowing that said action is illegal *66 and a fraud upon the people of the State of Indiana. And further that the said General Assembly by its officers and employees falsely and fraudulently made an official record in its journal showing that the Assembly adjourned sine die at eleven fifty-nine P.M. March 7, 1949, then and there well knowing that said statement was false and untrue.

'That among the said bills so passed illegally and fraudulently and in violation of the above Constitutional provisions were the following: House Bills numbered 379, 380 and 381 [Laws 1949, cc. 257, 232, 233] being budget bills of various officers and functions of the State of Indiana involving an expenditure of the funds of the State of Indiana in the sum of approximately $_____; House Bill 25, [Laws 1949, c. 277] being designated World War

Number Two Bonus Bill involving a large expenditure and also fifteen or twenty other bills involving expenditures and activities of various units and functions of government the exact nature and provisions thereof being unknown to plaintiff. That each and all of said above referred to bills as so falsely certified as having been passed by the said General Assembly are illegal and a fraud upon the taxpayers and citizens of the State of Indiana and in direct violation of the provisions of the Constitution of the State of Indiana.'

The Constitution of Indiana with reference to sessions of the General Assembly affecting this action, is as follows: 'The sessions of the General Assembly shall be held biennially at the capital of the State, commencing on the Thursday next after the first Monday of January, in the year one thousand eight hundred and fifty three, and on the same day of every second year thereafter, unless a different day or place shall have been appointed by law. But if, in the opinion of the Governor, the public welfare shall require it, he may, at any time by proclamation, call a special session.' Art. 4, § 9, Indiana Constitution.

*67 'The members of the General Assembly shall receive for their services, a compensation to be fixed by law; but no increase of compensation shall take effect during the session at which such increase may be made. No session of the General Assembly, except the first under this Constitution, shall extend beyond the term of sixty-one days, nor any special session beyond the term of forty days.' Art. 4, § 29, Indiana Constitution.

In his superb answer to Edmund Burke's 'Reflections on the French Revolution', Thomas Paine in 1791 defined and explained a constitution of a republic thus: 'A constitution is not a thing in name only, but in fact. It has not an ideal, but a real existence; and wherever it cannot be produced in a visible form, there is none. A constitution is a thing *antecedent* to government, and a government is only the creature of a constitution. *The constitution of a country is not the act of its government, but of*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 N.E.2d 547
228 Ind. 41, 89 N.E.2d 547
(Cite as: 228 Ind. 41, 89 N.E.2d 547)

Page 3

*the people constituting a government*. It is the body of elements, to which you can refer, and quote article by article; and which contains the principles on which the government**549 shall be established, the manner in which it shall be organized, the powers it shall have, the mode of elections, *the durations of parliaments, or by what other name such bodies may be called*; the powers which the executive part of the government shall have; and, in fine, everything that relates to the complete organization of a civil government, and the principles on which it shall act, and by which it shall be bound. A constitution, therefore, is to a government, what the laws made afterward by that government are to a court of judicature. That court of judicature does not make the laws, neither can it alter them; it only acts in conformity to the laws made; *and the government is in like manner governed by the constitution*.' (My italics.) 'Rights of Man' 1791, pages 48 and 49.

*68 In the one hundred fifty-eight years that have elapsed since this definition and explanation was made, nothing with greater clarity or simplicity has issued from any source on this subject. For similar definitions see 16 C.J.S., Constitutional Law, § 1, page 20, § 3, page 21; 11 Am. Jur., Constitutional Law, § 2, page 602. Many similar definitions and explanations have been given by this court. From some of these I quote as follows:

'* * * On this continent we came to the time when the people, by revolution, took to themselves sovereignty, and, in exercising supreme political power, chartered governments by written Constitutions. These organic instruments declared and guaranteed the rights and liberties of the individual, which had come to the people through centuries of struggle against absolutism in government. The majority was to rule, but under restraints and limitations which preserved to the minority its rights. 'By the Constitution which they establish, they not only tie up the hands of their official agencies, but their own hands as well; and neither the officers of the state, nor the whole people as an aggregate body,

are at liberty to take action in opposition to this fundamental law.' Cooley, Const. Lim (7th Ed.) 56. The government so instituted was representative of the creator of it, the people. The agencies and agents for administering it were the people's agents. * * *' Ellingham v. Dye, 1912, 178 Ind. 336, 342, 99 N.E. 1, 3, Ann.Cas.1915C, 200.

'In our system of government a written constitution is the highest expression of law. None other emanates directly from the sovereign people themselves. It is the deliberate and affirmative utterance of the sovereign majority. It seems unnatural to say that the sovereign majority, the authors of the designedly permanent, the fundamental, the organic law, intended that any of its safeguards should be abrogated by a failure to demand the abrogation; * * * On the contrary, one would expect a provision that the charter of our *69 liberties should stand unaltered until the sovereign majority by affirmative action expressed their desire for and effected a change. * * *' In re Denny, 1900, 156 Ind. 104, 108, 59 N.E. 359, 360, 51 L.R.A. 722.

Practically applying the definitions cited, the Supreme Court of the United States has said: 'The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances.' Ex parte Milligan, 1866, 4 Wall. 2, 18 L.Ed. 281, 295. The Alabama Supreme Court has correctly said: 'Every officer in the government, from the executive to the humblest magistrate, is charged, to the extent of his sphere, with the preservation of constitutional rights.' Sadler v. Langham, 34 Ala. 311, 329, quoted with approval in Banks v. State, 1921, 207 Ala. 179, 93 So. 293, 296, 24 A.L.R. 1359, 1363.

Quoting again from our court:

'* * * the discretion of Courts is more restricted in applying the rules of construction to a plan of government contained in a written constitution, than in the construction of statutes. And the reason is conclusive. Statutes are often hastily and unskillfully

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


89 N.E.2d 547
228 Ind. 41, 89 N.E.2d 547 .
(Cite as: 228 Ind. 41, 89 N.E.2d 547)

Page 4

drawn, and thus need construction to make them sensible. But constitutions import the utmost discrimination in the use of language. * * * 'They are the permanent will of the people, intended for the guidance of posterity.' Thus, Marshall, C.J., in relation to the Constitution of the United States: 'The framers of the **550 constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they said.' Gibbons v. Ogden, 9 Wheat. [1], 188 [6 L.Ed. 23].

*70 'So the dissenting opinion of Bronson, J., in The People v. Purdy, 2 Hill [N.Y.], 31, subsequently declared in the Court of Errors to be the law, and cited with marked approbation in Newell v. The People. 'Written constitutions will soon become of little value, if their injunctions may be lightly overlooked; and the experiment of setting a boundary to power will prove a failure.'

'* * * In construing the language of the constitution, Courts have nothing to do with the argument from inconvenience. Their sole duty is to declare, *ita lex scripta est-*thus saith the constitution. People v. Morrell, 21 Wend. [N.Y., 563], 584. ' Greencastle Tp. in Putnam County v. Black, 1855, 5 Ind. 557, 570, quoted with approval by Fansler, J., in Re Todd, 1934, 208 Ind. 168, 207, 193 N.E. 865.

It must necessarily follow that the Constitution of Indiana within its sphere is a commanding law for governors, General Assemblies, Courts and the people and covers with its protecting shield all classes of people, at all times, and under all circumstances.

Therefore, we may with truth say that the Constitution of Indiana is a command of the people of the state, providing for their government. The state government is of necessity a creature of the people created by their written constitution. In this case the creature is attempting to overrule, defy and control its creator. I cannot understand how this can ever be possible. This court by Hovey, J., has properly said:

'It has long since been beautifully declared by high authority, that 'a corrupt tree can not bring forth good fruit'. An unconstitutional provision can not be the basis of lawful proceedings.' Greencastle Township in Putnam County v. Black, 1854, 5 Ind. 557, 564, supra.

By the written constitution the people of the state have commanded the creation of the three departments *71 of government; they have definitely commanded that each department be vested with certain rights and that each be charged with the performance of certain duties; but they have likewise definitely commanded each department to obey certain limitations and prohibitions. It is with an alleged violation of the latter command of the people as carefully recorded in the state constitution that we are concerned in this case. That limitation and prohibition is contained in the last sentence of Section 29, Art. 4 of the State Constitution, thus: ' *No session of the General Assembly, except the first under this Constitution, shall extend beyond the term of sixty-one days, nor any special session beyond the term of forty days.*' (My italics.)

This is a self-executing prohibition on the power of the General Assembly to continue in session or to act. So long as it acts within the powers granted, its acts are valid. When it acts beyond those powers, and especially when it acts in contravention and open defiance of a positive prohibition of the constitution, its acts are revolutionary and necessarily void. This rule is so elementary it should not require the citation of authority to sustain it. The paucity of authorities is because during the one hundred thirty-three years of our State's existence, members of the General Assembly have never before attempted to enact laws after the expiration of the time allotted by the Constitution for such activity. So far as we can learn the members of the General Assembly or comparable legislative body of no state in the nation have ever attempted to exercise such unlawful power, with the single exception of the members of the Legislature of the State of Florida. When an Act passed by the members of the Le-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



03/18/2811  12:42   5413425213          LAW OFFICE OF JSS

89 N.E.2d 547
228 Ind. 41, 89 N.E.2d 547
(Cite as: 228 Ind. 41, 89 N.E.2d 547)

Page 5

gislature of that state after the elapse of the time al-
lotted by the state constitution for such activity and
which was falsely authenticated*72 and placed in
the records as having been properly enacted on the
last day of the session, came before the Supreme
Court of Florida, that court approved an action at-
tacking the laws so attempted to be enacted, and ad-
judged that proper action should be taken to correct
the legislative records involved to make them speak
the truth. **551State ex rel. Landis, Atty. Gen., v.
Thompson, 1935, 121 Fla. 561, 564, 565, 164 So.
192. It thus appears that the only direct authority on
the point in question is agreeable with my position.

Commenting on the State ex rel. Landis v.
Thompson, supra, decision, the Supreme Court of
Florida later said: "The rationale of that decision
was that if the Legislature has no constitutional
power to further legislate, or to further act as such
with regard to any legislative proposition after its
constitutional term of sixty days has run out, that
then, by the same token, no mere record it may
make of its nonconstitutional sitting as a Legis-
lature after it becomes *functus officio* can rise to
any greater evidentiary dignity in the consideration
of the courts than the unconstitutional setting itself
could rise. Accordingly, it was held that since the
courts are bound under the law to take judicial no-
tice of legislative records, but notice only of consti-
tutionally made records of the Legislature, as im-
porting absolute verity in their contents, they are
necessarily invested with inherent power to use
their appropriate judicial processes to expunge from
the range of their judicial observation in an appro-
priate case any purported legislative journal entries
that were not made in contemplation of law as a re-
cord of what the Legislature did during a constitu-
tionally authorized sitting as a Legislative As-
sembly.' State ex rel. Cunningham et al. v. Davis,
Jr. et al., 1936, 123 Fla. 41, 57, 166 So. 289, 295.

By its repeated decisions the Florida Supreme
Court has held that the prohibitive orders of the
people expressed*73 in the Constitution by which
they created their government must be obeyed by

the Legislature; that any pretended action in contra-
vention and defiance of such prohibitive orders is
null and void; and that the Supreme Court has the
power by appropriate processes to expunge 'from
the range of their judicial observation' any purpor-
ted laws that were not enacted during a
'constitutionally authorized sitting of' the Legis-
lature. The Florida decisions are the only decisions
directly applicable to the instant case.

I agree with the majority opinion 'that the court
takes judicial notice of public law; it is presumed to
know what it is, and it is its duty to know it.' [ 88
N.E.2d 746, 747] But in the case before us, the
averments of the complaint must be taken as true.
So considering the issue, the laws complained of
could not become the public law of the state, for
they were attempted to be enacted by the members,
after the General Assembly had become *functus of-
ficio*, is open and utter contravention and defiance
of the express prohibitions contained in the last sen-
tence of Section 29, Art. 4 of the Indiana Constitu-
tion, supra. If we follow the rule of taking judicial
notice of public law as quoted in the majority opin-
ion and noted above, we must in the instant case
follow the further rule that we must accept as true
the well pleaded facts contained in the complaint,
particularly grammatical paragraphs 6 and 7 there-
of. So, we must know that the laws attacked are
wholly spurious and should be judicially declared
void. For after the expiration of the time the people
of the state by the constitution have allotted for the
regular session, the members of the Assembly have
no more authority to enact laws than any other
group of citizens of the state. Should the General
Assembly within the time allotted by the constitu-
tion fail to pass a motion to adjourn *sine die*, the
constitution steps in *74 and effectively performs
that duty for it. The constitution is the commanding
voice of the people of the state.

I think it is the law as stated in the majority opinion
'that a proper authentication of an enrolled act is
conclusive, as a matter of law that the act was duly
passed in conformity to the constitution.' But there

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



89 N.E.2d 547
228 Ind. 41, 89 N.E.2d 547
(Cite as: 228 Ind. 41, 89 N.E.2d 547)

Page 6

is no such presumption of conclusiveness unless the authentication is proper. The complaint in this case directly attacks the improper authentication of the questioned laws and procedure. I think we as a court have failed to perform our duty unless we pass upon this particular point of attack, and pass upon it in the light of the constitutional prohibitions aforenoted. The people have no other defense to the evils flowing from the usurpation of power by the members of the General Assembly, but by the impartial enforcement of the constitution.

The majority opinion takes the position that we are bound by the false and fraudulent authentication of the questioned Acts. I think this position is not only erroneous **552 but is exceedingly ominous, a violent assault upon the constitution, an open approval of fraud upon the people, a special favor to government at the expense of freedom that may lead to quite unpredictable results. It is a stealthy encroachment upon, and a gradual depreciation of the people's rights under the constitution. Banks v. State, 1921, 207 Ala. 179, 93 So. 293, 24 A.L.R. 1359, 1362, supra. As the case is before us it clearly appears that the Acts questioned were agreed upon by the members after the constitutional close of the regular session of the 86th General Assembly. The false authentication, by the members of the constitutionally adjourned Assembly, gives them no validity whatever. In this case the validity of an Act regularly passed in either a general or special session *75 but irregularly authenticated is not before us, and the authorities cited in the majority opinion on that proposition are not applicable in this case. The matter before us questions a whole series of spurious Acts agreed upon, and a course of spurious procedure had by the members of the General Assembly after the constitutional close of the regular session 1949, and the effort to make these Acts and this procedure valid laws by the false and fraudulent method of predating their authentication. The General Assembly is not charged with committing a fraud. The fraud charged was committed by its members after the session was constitutionally ended.

Apparently conceding the truth of the unusual proceedings charged in the complaint, and also probably as a partial excuse for the equally unusual position of expedience taken by the majority, the opinion asserts: 'If the members of the General Assembly violate their constitutional duties on adjournment, they can be defeated the next time such offices come up for election, but the remedy is not with the courts.' This gem of thought is quite gratuitous and the suggested remedy is no remedy at all. The unlawful action has been taken and injury and damage are flowing therefrom. The defeat of the erring members at ensuing elections would in no manner eliminate the foisted laws. The acknowledged evil is so great as to threaten seriously the continued existence of a people's government. The majority opinion gives the stamp of approval to this course of conduct by the members of the General Assembly after the permanent adjournment of the session. It gives a license for the adoption of this course of procedure by future members of the General Assembly and may be cited as judicial authority therefor. If the members of the General Assembly violated the constitution by stopping the clocks and continuing to *76 operate for two days after its constitutional close by following the 'stopped clocks' time, this court has done precisely the same thing and committed the same error by the majority opinion. This usurpation of power in defiance of the express constitutional prohibition noted can bind no one legally, but is a serious threat to constitutional government.

The faithful performance of official duties commanded by the constitution is in no sense an assertion of superior purity by the courts. The Constitution of the state charges the courts with many very definite duties, some of which are: 'All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.' Art. 1, § 12, Indiana Constitution.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 N.E.2d 547
228 Ind. 41, 89 N.E.2d 547
(Cite as: 228 Ind. 41, 89 N.E.2d 547)

Page 7

It is a duty of this court, and was a duty of the trial court, to be open to the plaintiff's relator, not to brush him off without a hearing, but to give him and the people he represents, being all the citizens of the state, their remedy 'by due course of law'. They were and are entitled to justice 'completely, and without denial'. I refuse to believe as the majority opinion indicates, that the rights of a citizen or of all the citizens like those questioned here may be denied or abused without a remedy. If such rights can be so denied, then our constitution is meaningless-a thing in name only, having an ideal, but not a real existence.

Simply stated the question presented in this case-considered on its merits-is whether the members of the General Assembly, after the constitutional close of a **653 regular session, may by the simple process of *77 stopping the clocks, remain in session and lawfully function for a period of two days thereafter, and whether the laws agreed upon and other action taken during that period by such members is made valid by having it falsely and fraudulently authenticated by dating it as having been done two days earlier? Among other excuses the majority opinion seems to hold that because the fraud was committed by the General Assembly this correlative department of state government may not interfere by ordering the correction of the fraud or the elimination of the laws it produced. While I do not agree with this statement of the law, I shall not discuss it because that question is not before us in this case, for we do not have a General Assembly except when the members thereof are in either general or special session agreeable with the State Constitution, Sections 9 and 29, Art. 4, supra. They were not in session, either general or special, after March 7, 1949. All the fraudulent Acts and procedure complained of were agreed upon by the constitutionally adjourned members on March 8 and 9, 1949, when they were totally without legislative power. Their fraud consisted in predating the authentication of these Acts to make them appear as having been enacted prior to the constitutional close of the session. The majority opinion apologizes-

ically approves this conduct and attempts to validate these spurious acts.

It is basically erroneous to say that the courts are without power to remedy violations of constitutional limitations and prohibitions by officials and members of the executive, or legislative departments of the state government. When such violations are brought before us directly as is done in this case it is our duty to act; not to rely upon mere inertia to excuse the performance of positive duty. I approve and adopt as my own, a statement of the Alabama Court of Appeals with respect*78 to the court's duty when faced with the admitted facts in this case, as follows: 'The power to forgive, condone, or heal the violation of plain, unambiguous mandates, prohibitions, or limitations of the Constitution is denied to the courts and judges of this state, although such violation may result in the greatest good, or may promote a universal benefaction.' Banks v. State, 1921, 207 Ala. 179, 93 So. 293, 297, 24 A.L.R. 1359, 1364, supra. See also Bradley v. State (Taylor v. State), Ind.Sup., 1949, 84 N.E.2d 580, and cases cited. Hoy v. State, 1947, 225 Ind. 428, 75 N.E.2d 915.

However, the majority opinion now becomes the law of the state. Of course, if the members of the General Assembly may legally enact laws in this manner two days after the constitutional close of the session, they may continue to do so until the beginning of the next regular session nearly twenty-two months later, and the state may be burdened with a perpetual session of the General Assembly without any lawful change in the State Constitution providing therefor. I think the majority opinion may be cited as authority for this course of procedure. What then becomes of the state constitution? Answering again, we must say it ceases to exist in fact and becomes only an ideal. It is destroyed by its own creatures-the members of an adjourned General Assembly. I cannot follow this revolutionary idea. The petition for rehearing should be sustained and the judgment should be reversed.

Ind. 1950

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

89 N.E.2d 547
228 Ind. 41, 89 N.E.2d 547
(Cite as: 228 Ind. 41, 89 N.E.2d 547)

State ex rel. Cline v. Schricker
228 Ind. 41, 89 N.E.2d 547

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in N.W.2d, 2003 WL 21793993 (Minn.App.)
(Cite as: 2003 WL 21793993 (Minn.App.))

Page 1

C
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS
UNPUBLISHED AND MAY NOT BE CITED EX-
CEPT AS PROVIDED BY MINN. ST. SEC.
480A.08(3).

Court of Appeals of Minnesota.
Charles Gordon LONG, Appellant,
v.
STATE of Minnesota, Respondent.
No. A03-9.

Aug. 5, 2003.

Goodhue County District Court, File No. K4941717.
Charles G. Long, Red Wing, MN, pro se appellant.

Mike Hatch, Attorney General, Sean R. McCarthy,
Assistant Attorney General, St. Paul, MN, and
Stephen Betcher, Goodhue County Attorney, Chris-
topher J. Schrader, Assistant County Attorney, Red
Wing, MN, for respondent.

Considered and decided by SCHUMACHER,
Presiding Judge, TOUSSAINT, Chief Judge, and
KALITOWSKI, Judge.

UNPUBLISHED OPINION

ROBERT H. SCHUMACHER, Judge.

*1 Appellant Charles Gordon Long challenges the
denial of his motion to expunge all records of crim-
inal sexual conduct charges brought against him be-
ginning in 1995. We affirm.

FACTS

In early December 1994, police in Kenyon, Min-

nesota, received a citizen's tip that Long was en-
gaged in sexual relationships with underage boys.
Police interviewed one of the boys, D.G.B., who
told them that he and Long had engaged in sex acts
and that he believed Long had done so with other
boys as well. Based on this information, police
charged Long with criminal sexual conduct in the
third degree. The charge was later amended to at-
tempted criminal sexual conduct in the fourth de-
gree.

On January 13, 1995, Long pleaded guilty. Long
was allowed to withdraw the plea at sentencing,
however, because he had not previously been in-
formed of the mandatory five-year term of condi-
tional release that would attach to his sentence.

On February 24, 1995, Long appeared before the
court without counsel and entered an Alford-type
guilty plea to the same charge. The court accepted
the plea and Long was sentenced accordingly. Two
years later, Long petitioned for postconviction re-
lief, alleging among other things, that he had been
denied adequate access to counsel. The petition was
granted, Long's guilty plea and sentence were va-
cated, and the complaint was reinstated.

It appears that the parties entered into plea negoti-
ations immediately thereafter, and an omnibus hear-
ing was never held. Long agreed to plead guilty to
fifth-degree assault. In return, the state dismissed
the complaint and re-charged the crime as fifth-
degree assault. The court accepted this agreement,
and Long pleaded guilty to fifth-degree assault.

In June 2002, Long moved to have all records of
the sex charge expunged. Long argued that all mat-
ters involving the sex charge had been resolved in
his favor and should be expunged pursuant to
Minn.Stat. § 609A.02, subd. 3 (2002). The district
court denied the motion, reasoning that the fifth-
degree assault charge arose from the same factual
basis as the sex charge. There was no finding that
Long was not guilty of the sex charge, such as an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.W.2d, 2003 WL 21793993 (Minn.App.)
(Cite as: 2003 WL 21793993 (Minn.App.))

acquittal or outright dismissal; therefore, the matter had not been resolved in his favor, and expungement was not warranted. The district court also noted that the public's interest in maintaining a record of the charge outweighed any adverse effect on Long.

Long moved for a new trial or amended findings on the expungement issue. He argued that the district court misapplied the law, and alternatively, that the refusal to expunge violated the terms of his plea agreement and he should be permitted to withdraw that plea. The motion was denied.

## DECISION

The construction and interpretation of a statute is a question of law, which this court reviews de novo. *State v. Ambaye,* 616 N.W .2d 256, 258 (Minn.2000). Minn.Stat. § 609A.02, subd. 3 (2002) states that

a petition may be filed * * * to seal all records relating to an arrest, indictment, or information, trial, or verdict * * * if all pending actions or proceedings were resolved in favor of the petitioner.

*2 Whether all proceedings were resolved in the appellant's favor is a question of law this court reviews de novo. *State v. Davisson,* 624 N.W.2d 292, 295 (Minn.App.2001), *review denied* (Minn. May 15, 2001). Once the petitioner has met the legal threshold of showing that all matters were resolved in his favor,

the court shall grant the petition to seal the record unless the agency or jurisdiction whose records would be affected establishes by clear and convincing evidence that the interests of the public and public safety outweigh the disadvantages to the petitioner of not sealing the record.

Minn.Stat. § 609A.03, subd. 5(b) (2002).

Long argues that there was never a finding of probable cause with respect to the sex-crime charge. He argues that because that complaint was ultimately

dismissed without a finding of probable cause, the matter was resolved in his favor. We disagree. It is clear that a criminal defendant may plead guilty to an offense without an omnibus hearing or other formal determination of probable cause. *See, e.g., Doughman v. State,* 351 N.W.2d 671, 673 (Minn.App.1984) (defendant waived his right to omnibus hearing and pleaded guilty), *review denied* (Minn. Oct. 16, 1984). The fact that an omnibus hearing was never held does not necessarily mean that Long's record must be expunged.

Long next argues that his withdrawn and vacated guilty pleas cannot be substituted for a finding of probable cause. In general, Long is correct that vacated or withdrawn guilty pleas should not be used against a defendant in a later proceeding. Minn. R.Crim. P. 15 .06; Minn. R. Evid. 410. But caselaw suggests that in expungement cases, the court may under some circumstances consider a vacated or withdrawn guilty plea. Numerous cases show that dismissal or vacation of charges after the defendant completes the terms of a deferred sentence does not constitute a resolution in the defendant's favor. *See City of St. Paul v. Froysland,* 310 Minn. 268, 275-76, 246 N.W.2d 435, 439 (1976); *State v. M.B.M.,* 518 N.W.2d 880, 883 (Minn.App.1994). In any event, we need not "substitute" Long's withdrawn and vacated pleas for a finding of probable cause because Long pleaded guilty to a charge arising from the 1994 incident.

Long likens his case to that of *State v. C.A.,* 304 N.W.2d 353 (Minn.1981). There, the state dropped charges against the defendant after the supreme court set aside his conviction and remanded for a new trial pursuant to a stipulation between the defendant and the state. *Id.* at 355. The supreme court determined that that matter had been resolved in the defendant's favor. *Id.* But *C.A.* is distinguishable. Here, rather than dropping all charges against Long after his conviction was vacated, the state entered into plea negotiations with him. As part of the plea agreement, the state re-charged Long with fifth-degree assault. There was no new investigation, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in N.W.2d, 2003 WL 21793993 (Minn.App.)
(Cite as: 2003 WL 21793993 (Minn.App.))

It is clear that the state did intend to re-prosecute Long. Thus, "all * * * proceedings" were not resolved in Long's favor. Long disputes whether the factual basis for the vacated pleas and his ultimate fifth-degree-assault plea was the same. But it is clear that the original allegation that Long engaged in illicit conduct with D.G.B. on November 5 or 6, 1994 did indeed form the basis for all the pleas.

*3 The dismissal of the original criminal sexual conduct complaint was a product of the plea agreement, not the state's determination that the charge was not worth pursuing. Because Long pleaded guilty to fifth-degree assault, a formal finding of probable cause was unnecessary. This is not a resolution in Long's favor. Because Long did not meet this legal threshold, the district court was under no statutory obligation to grant Long's expungement motion.

Further, the district court did not abuse its discretion by finding that the public's interest in maintaining records outweighed the disadvantages to Long. See Ambaye, 616 N.W.2d at 261 (holding district court has inherent power to expunge if benefits to petitioner outweigh public interest). The district court explicitly stated that there had been no infringement on Long's constitutional rights and that he had been able to take advantage of a very favorable plea agreement. The court also found that Long's interest in easing his employment search was outweighed by the public right to access records of the arrest and court file. The records in question show that Long was implicated in illicit sexual activity involving at least one underage boy. We conclude that the interests of public safety in maintaining these records outweigh any disadvantage to Long.

Long moved this court to strike a document included in respondent's appendix. The state inserted the document as the fifth-degree assault complaint that formed the factual basis for Long's plea. Long disputes that this is a true and correct copy of that complaint. Because the document is outside the Goodhue County file received by this court and be-

cause the state has not shown that it is in fact a true and correct copy of the complaint, we grant Long's motion to strike.

Affirmed; motion granted.

Minn.App.,2003.
Long v. State
Not Reported in N.W.2d, 2003 WL 21793993 (Minn.App.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

676 N.W.2d 337
(Cite as: 676 N.W.2d 337)

Page 1

℗

Court of Appeals of Minnesota.
STATE of Minnesota, Appellant,
v.
Stephen Matthew SCHULTZ, Respondent.
No. A03-1240.

March 30, 2004.

**Background:** City and state appealed from decision of the District Court, Hennepin County, Allen Oleisky, J., expunging defendant's felony assault conviction records.

**Holdings:** The Court of Appeals, Husponi, J., held that:

(1) trial court's exercise of its inherent expungement power was warranted;

(2) court's inherent authority to order expungement did not extend to non-judicial records retained by the executive branch, absent implication of defendant's constitutional rights; and

(3) reversed based on court's order that city seal non-judicial records applied to appealing and non-appealing executive agencies.

Affirmed in part, reversed in part.

**West Headnotes**

**[1] Criminal Law 110 ☞1226(3.1)**

110 Criminal Law
    110XXVIII Criminal Records
        110k1226 In General
            110k1226(3) Expungement or Correction;
Effect of Acquittal or Dismissal
                110k1226(3.1) k. In General. Most
Cited Cases
There are two legal bases that provide for the expungement of a petitioner's criminal records: (1) a party may petition for expungement pursuant to statute if the criminal proceedings were resolved in favor of the petitioner, and (2) a party may move

for expungement pursuant to the court's inherent expungement power. M.S.A. § 609A.02.

**[2] Criminal Law 110 ☞1226(3.1)**

110 Criminal Law
    110XXVIII Criminal Records
        110k1226 In General
            110k1226(3) Expungement or Correction;
Effect of Acquittal or Dismissal
                110k1226(3.1) k. In General. Most
Cited Cases
Trial court's inherent expungement power may be exercised where the petitioner's constitutional rights may be seriously infringed by retention of his records, or, where constitutional rights are not involved, when the court finds expungement will yield a benefit to the petitioner commensurate with the disadvantages to the public from the elimination of the record and the burden on the court in issuing, enforcing and monitoring an expungement order.

**[3] Criminal Law 110 ☞1226(3.1)**

110 Criminal Law
    110XXVIII Criminal Records
        110k1226 In General
            110k1226(3) Expungement or Correction;
Effect of Acquittal or Dismissal
                110k1226(3.1) k. In General. Most
Cited Cases
The exercise of a court's inherent power to expunge is a matter of equity, and thus the Court of Appeals reviews the district court's conclusion under an abuse of discretion standard.

**[4] Criminal Law 110 ☞1158.1**

110 Criminal Law
    110XXIV Review
        110XXIV(O) Questions of Fact and Findings
            110k1158.1 k. In General. Most Cited
(Formerly 110k1158(1))
A district court's findings of fact will not be set

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

03/18/2011  12:42  5413425213          LAW OFFICE OF JSS

676 N.W.2d 337
(Cite as: 676 N.W.2d 337)

Page 2

aside unless clearly erroneous.

**[5] Criminal Law 110 ⟳1158.9**

110 Criminal Law
  110XXIV Review
    110XXIV(O) Questions of Fact and Findings
      110k1158.8 Evidence
        110k1158.9 k. In General. Most Cited
Cases
    (Formerly 110k1158(1))
"Clearly erroneous" means manifestly contrary to the weight of the evidence or not supported by the evidence as a whole, for purposes of appellate court's standard of review for trial court's findings of fact.

**[6] Criminal Law 110 ⟳1226(3.1)**

110 Criminal Law
  110XXVIII Criminal Records
    110k1226 In General
      110k1226(3) Expungement or Correction;
Effect of Acquittal or Dismissal
        110k1226(3.1) k. In General. Most
Cited Cases
Benefit to defendant in obtaining better employment or housing by expunging his felony assault conviction records outweighed the burden to the public of eliminating the access of a prospective employer or landlord to defendant's criminal history, and thus trial court's exercise of its inherent expungement power was warranted; defendant was arrested shortly after his 18th birthday and before graduating from high school, he had psychological difficulties that he had since controlled through medication, defendant had undergone extensive rehabilitation efforts, record reflected no new criminal incidents and defendant had difficulty overcoming his employment and housing problems.

**[7] Criminal Law 110 ⟳1226(3.1)**

110 Criminal Law
  110XXVIII Criminal Records
    110k1226 In General

      110k1226(3) Expungement or Correction;
Effect of Acquittal or Dismissal
        110k1226(3.1) k. In General. Most
Cited Cases
When an aggrieved party's constitutional rights are not infringed, the district court's inherent authority to order expungement shall not extend to non-judicial records retained by the executive branch.

**[8] Criminal Law 110 ⟳1226(3.1)**

110 Criminal Law
  110XXVIII Criminal Records
    110k1226 In General
      110k1226(3) Expungement or Correction;
Effect of Acquittal or Dismissal
        110k1226(3.1) k. In General. Most
Cited Cases
Reversal by Court of Appeals of trial court's order, which required city to seal defendant's non-judicial criminal records, on the basis that court's inherent authority to order expungement did not extend to non-judicial records retained by the executive branch when constitutional rights were not implicated applied to both appealing and non-appealing executive agencies, would undermine the common goals of uniform management of documentation and effective deterrence of recidivism, and a limited reversal would not provide full and effective relief for the appealing party.

**\*339 Syllabus by the Court**

1. A district court has broad discretion to expunge judicial records if such expungement reduces or eliminates unfairness to an aggrieved party.

2. When an aggrieved party's constitutional rights are not infringed, the district court's inherent authority to order expungement shall not extend to non-judicial records retained by the executive branch.

3. Because executive agencies party to an expungement action share not only interwoven but identical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

676 N.W.2d 337
(Cite as: 676 N.W.2d 337)

Page 3

interests, a reversal in favor of an appealing agency
may also extend to non-appealing agencies.

Mike Hatch, Attorney General, St. Paul, MN; and
Peter A. MacMillan, Michele R. Wallace, MacMillan & Wallace, PLLP, Minneapolis, MN, for appellant.

Leonardo Castro, Chief 4th District Public Defender, Barbara S. Isaacman, Assistant Public Defender, Minneapolis, MN, for respondent.

Considered and decided by TOUSSAINT, Chief Judge, HALBROOKS, Judge, and HUSPENI, Judge.

## OPINION

HUSPENI, Judge.FN*

> FN* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

In challenging an order granting respondent's petition for expungement of his felony assault conviction records, appellant argues that the district court abused its discretion in exercising its inherent authority to expunge. Alternatively, appellant argues that if any exercise of inherent authority was proper, such authority is limited to expungement of judicial records, and does not extend to records of the executive branch. Because the district court has broad discretion over all court records and agents of the court, we affirm its order to expunge all judicial records pertaining to respondent's conviction. Because the court's inherent authority to expunge is limited in cases not involving a petitioner's constitutional rights, we reverse the portion of the order sealing non-judicial records maintained by the executive branch. Since all executive agencies party to this action share identical interests, this reversal extends to both appealing and non-appealing executive agencies.

## FACTS

On July 23, 1996, 18-year-old respondent Steven M. Schultz was arrested for second-degree assault, a felony under Minn.Stat. § 609.222 (1994). He pleaded guilty to that offense on March 4, 1997, after learning from counsel that his conviction could later be set aside upon good behavior pursuant to the "youthful offender" statute, codified at †340Minn.Stat. § 609.166 (1994). Unbeknownst to either Schultz or his attorney, however, the "youthful offender" statute had been repealed in the previous legislative session. 1996 Minn. Laws ch. 408, art. 9, § 10.

Schultz's prison sentence was stayed for three years subject to several conditions, including service of jail time. During this period, he enrolled in behavioral therapy, improved his vocational skills, and volunteered in his community. He was discharged from probation on March 6, 2000, and the felony was reduced to a misdemeanor.

Schultz subsequently petitioned for expungement of all data related to the offense, claiming that, though the court was ultimately reduced to a misdemeanor, any record check conducted on him would reveal that he had pleaded guilty to a felony. Thus, he asserted, he was unable to find gainful employment or adequate housing.

Both appellant City of Crystal ("the city")FN1 and the State of Minnesota (state) objected to the expungement, arguing (1) the circumstances surrounding Schultz's conviction do not qualify him for expungement, and (2) the court's inherent power to expunge records does not extend to the executive branch.

> FN1. There is some debate as to appellant's proper name in these proceedings. Schultz argues that appellant should be referred to as the Crystal Police Department because other city executive agencies are unaffected by the court's order. See Minn.Stat. §§ 388.051, subd. 1(c), 487.25, subd. 10

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

676 N.W.2d 337                                          Page 4
(Cite as: 676 N.W.2d 337)

(2002) (felonies prosecuted not by the city attorney's office, but by the county attorney). Though true, a police department is a component of city government. *State v. C.A.*, 304 N.W.2d 353, 361 (Minn.1981). As such, it is entirely appropriate for this court to refer to appellant as City of Crystal.

The district court, in granting Schultz's petition and ordering all public records relating to the arrest, indictment, trial, and subsequent discharge sealed, stated:

There is clear and convincing evidence that sealing the record would yield a benefit to [Schultz] commensurate with the disadvantage to the public and public safety of: (1) sealing the record; and (2) burdening the court and public authorities to issue, enforce and monitor an Expungement Order (Minn.Stat. § 609A.03, subd. 5(2)).

. . . .

The court administrator shall notify the following of this order: County Attorney, Crystal City Police Department, Hennepin County Sheriff, and the Bureau of Criminal Apprehension.

Only the city now appeals.

### ISSUES

1. Did the district court, in exercising its inherent authority, abuse its discretion by expunging judicial records?

2. Did the district court err in ordering the expungement of executive records?

3. May the City of Crystal assert the rights of parties not before this court?

### ANALYSIS

[1][2] There are two legal bases that provide for the expungement of a petitioner's criminal records. The first is statutory: a party may petition for expungement if the criminal proceedings were "resolved in favor of the petitioner." *State v. Ambaye*, 616 N.W.2d 256, 257 (Minn.2000) (quoting Minn.Stat. § 609A.02, subd. 3). The second basis is the court's inherent expungement power. *Id.* This inherent power may be exercised "where the petitioner's constitutional rights may be seriously infringed by retention of his records," or, where constitutional rights are not involved, when the court finds "expungement will yield a benefit to the petitioner commensurate with the disadvantages*341 to the public from the elimination of the record and the burden on the court in issuing, enforcing and monitoring an expungement order." *Id.* at 258.

The parties agree that Minn.Stat. § 609A.02 (2002) cannot apply to Schultz because the proceedings were not resolved in his favor. *See id.* at 259 (concluding that the term "in favor of" "includes verdicts of not guilty and voluntary dismissals, and does not include resolutions where the defendant pleaded guilty"); *City of St. Paul v. Froysland*, 310 Minn. 268, 275-76, 246 N.W.2d 435, 439 (1976) (concluding that the statute was not intended to protect those who pleaded guilty). This court therefore need only address the propriety and scope of a district court's exercise of its inherent power to grant expungement. Further, because Schultz does not allege that his constitutional rights are involved in this matter, we limit our discussion to the inherent power of the court to grant expungement in the absence of constitutional concerns.

### I.

[3][4][5] "The exercise of a court's inherent power to expunge is a matter of equity, and we therefore review the district court's conclusion under an abuse of discretion standard." *Ambaye*, 616 N.W.2d at 261. A district court's findings of fact will not be set aside unless clearly erroneous. *Novack v. Northwest Airlines, Inc.*, 525 N.W.2d 592, 597

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


676 N.W.2d 337
(Cite as: 676 N.W.2d 337)

Page 5

(Minn.App.1995). Clearly erroneous means "manifestly contrary to the weight of the evidence or not supported by the evidence as a whole." *Id.*

[6] The city first claims that because Schultz "is only experiencing the fruits of his prior conduct," the district court abused its discretion when it exercised its inherent authority in any manner or to any extent. Specifically, the city urges that there is no support for the determination of the district court that the benefit to Schultz in obtaining better employment or housing outweighed the burden to the public of eliminating the access of a prospective employer or landlord to Schultz's criminal history. Our examination of the record, however, reveals support for the district court's determination on this issue.

Schultz was arrested for second-degree assault shortly after his eighteenth birthday and before graduating from high school. He had had psychological difficulties before the incident, and has since controlled those difficulties through medication. Prior to his guilty plea, Schultz's public defender mistakenly advised him that his record could be expunged after five years. He has also undergone extensive rehabilitation efforts, including volunteering in the community, treatment, and vocational training. The record reflects no criminal incidents since the 1996 arrest. Further, it is undisputed that Schultz has had difficulty overcoming his employment and housing problems.

We conclude that there is ample support in the record for granting expungement, and that the trial court did not err in concluding that the benefits to Schultz were commensurate with the disadvantages to the public and the burden on the court. As such, we shall not disturb the district court's expungement of all judicial records relating to Schultz's conviction.[FN2] *See State v. C.A.*, 304 N.W.2d 353, 358 (Minn.1981).

> FN2. We note also that the district court that granted Schultz's petition for expungement was the same court that accepted his

guilty plea in 1997.

**II.**

[7] The city next argues that even if the district court did not abuse its discretion*342 in determining that expungement was proper, it lacked the authority to seal non-judicial records possessed by the executive branch. This is the more difficult of the issues raised by the city, and existing caselaw addressing the issue does not appear to be entirely consistent. A careful review of the precedent established by both this court and the Minnesota Supreme Court convinces us, however, that the city is correct in its assertions.

In *C.A.*, the supreme court first clearly defined the authority to grant expungement when a petitioner's constitutional rights are not involved, framing the issue as the "inherent power enabling courts to grant relief when it is necessary to the performance of their unique judicial functions." *Id.* at 358. The *C.A.* court held that expungement may be ordered when "essential to the existence, dignity, and function of a court because it is a court." *Id.* (quoting *Clerk of Lyon County v. Lyon County Comm'rs*, 308 Minn. 172, 176, 241 N.W.2d 781, 784 (1976)). Part of that "function," the court held, is to control court records and agents of the court to prevent unfairness to individuals. *Id.*

The *C.A.* court also stated that, under appropriate circumstances, sheriffs and prosecutors could be considered "agents of the court" and therefore "within the reach of the court's inherent power to control its internal processes," *Id.* at 360, and that, to a limited extent, named individuals in police departments could also be subject to orders not to disclose in certain situations. *Id.* at 361. The court cautioned, however, that because this inherent authority "extends only to its unique judicial functions," courts must "proceed cautiously" in order to respect the authority of the executive and legislative branches of government. *Id.* at 358-59.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

676 N.W.2d 337
(Cite as: 676 N.W.2d 337)

In *State v. P.A.D.*, 436 N.W.2d 808 (Minn.App.1989), *review denied* (Minn. May 12, 1989), the district court had denied a petition for expungement, reasoning that because the petitioner alleged no violation of constitutional rights no relief was possible. This court commendably recognized that "although courts are empowered to order expungement, they 'must proceed cautiously in exercising that authority in order to respect the equally unique authority of the executive and legislative branches of government.' " *Id.* at 810.

Relying upon *C.A.*, however, the *P.A.D.* court remanded the matter to the district court, and observed that "trial courts are [not] precluded from ordering that records and materials controlled by the other two branches of government be returned or sealed, if doing so is necessary or conducive to fashioning a meaningful remedy." *Id.*

In focusing solely on *C.A.'s* caveat that inherent authority to expunge should be exercised with caution and respect for the other branches of government, *P.A.D.* appeared to grant far broader inherent powers to expunge than did *C.A.* Under *P.A.D.*, the court's authority to expunge suddenly appeared to extend in cases not involving constitutional rights to *any* individual or agency and *any* record provided the benefit to the petitioner was commensurate with any disadvantage to the public or burden on the court. *Id.* The court in *P.A.D.* failed to address what, we conclude, was a critical qualification in *C.A.*: that a court's authority to expunge under these circumstances "[e]xtends only to its unique judicial functions." *C.A.*, 304 N.W.2d at 358.

In *In re Quinn*, the supreme court clarified and reemphasized the limits on the judicial authority to control other branches of government when neither statutory nor constitutional rights require. 517 N.W.2d 895, 897-98 (Minn.1994). The petitioner in *Quinn*, a professional hockey player arrested*343 after allegedly raping a woman in a hotel, attempted to seal his arrest records after the county attorney decided not to press charges. *Id.* at 897. Both the

district court and the court of appeals, relying on *C.A.*, found that the petitioner's arrest record could be expunged, and his investigative file sealed. *Id.* Though the supreme court ultimately reversed the court of appeals' decision because of the Minnesota Data Practices Act, it reinforced *C.A.'s* holding that a court's inherent authority to expunge without constitutional implications extends only to "unique judicial functions," and determined that the arrest records at issue were not "judicial records" as required under *C.A.* See *id.* at 900.

Recently, in *State v. T.M.B.*, this court relied on *Quinn*, and recognized the court's lack of inherent authority to expunge non-judicial executive records absent evidence of an injustice resulting from an abuse of discretion in the performance of a governmental function. *State v. T.M.B.*, 590 N.W.2d 809, 813 (Minn.App.1999), *review denied* (Minn. June 16, 1999). In so declaring, the *T.M.B.* court noted that "[t]he function of preparing and maintaining criminal records is a unique constitutional function of the executive branch." *Id.* at 812. As such, a court may not intrude upon this function unless such intrusion is essential to the existence, dignity, and function of the court. *Id.* Expungement, the court held, becomes "essential" only when a petitioner's constitutional rights have been violated. *Id.* And although we acknowledged the court's inherent authority first recognized in *C.A.* to control court records and agents of the court, we noted that *criminal* records are not *court* records, and therefore fall outside the scope of the court's authority *under* the separation-of-powers doctrine. *Id.*

Schultz argues that *T.M.B.* was wrongly decided, and inappropriately relied on *Quinn* to come to a conclusion that "flies in the face" of previous case-law. We cannot agree. In holding that the separation-of-powers doctrine prevents expungement of records held by other branches of government absent evidence that executive agents abused their discretion in the performance of a governmental function, *T.M.B.* remains consistent with *C.A.*, which limited the court's inherent authority to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

676 N.W.2d 337
(Cite as: 676 N.W.2d 337)

Page 7

"unique judicial functions," corresponding court records, and agents of the court. C.A., 304 N.W.2d at 358. T.M.B.'s reliance on Quinn to hold that non-judicial records remain outside of the scope of the court's inherent authority was therefore proper. [30]

> FN3. Schultz argues that this court should consider that Ambaye, the most recent supreme court case addressing a court's authority to expunge, makes no reference to Quinn, and relies instead on earlier cases, such as C.A. Though true, the expungement order in dispute in Ambaye extended only to his indictment and prosecution-in other words, "court records." Ambaye, 616 N.W.2d at 257. Ambaye did not address non-judicial records possessed by another branch of government.

To the extent that P.A.D. appears to condone judicial intrusion, without constitutional implications, into the affairs of other branches of government, it must be read cautiously, construed narrowly, and brought within the analysis and rationale of C.A. and Quinn. As indicated earlier, the existing Minnesota caselaw has neither guided nor informed our decision here in a totally consistent manner. We conclude, however, that the important separation-of-powers issues implicated in expungement questions and the public policy concerns present in those questions compel the decision we reach.

Considering the limitations that we conclude have been placed by both the supreme*344 court and this court on the power to order expungement of records possessed by other branches of government, the district court in this case overstepped its authority by ordering the executive branch to seal non-judicial records. As such, that portion of the district court's order must be reversed.

## III.

[8] Because the city is the sole executive agency appealing the district court order, we must now ex-amine whether our reversal should extend to non-appealing agencies. Schultz contends that it should not because those parties failed to join the appeal, file separate notices of appeal, or file notice of review.

A number of Minnesota cases state the general rule that a reviewing court may not address issues not preserved for appeal. E.g., Olson v. Lyrek, 582 N.W.2d 582, 584 n. 1 (Minn.App.1998); City of Ramsey v. Holmberg, 548 N.W.2d 302, 305 (Minn.App.1996), review denied (Minn. Aug. 6, 1996). The Minnesota Supreme Court has also recognized that, in general, an appealing party may not assign errors affecting other parties. Mecath v. Svoboda, 253 Minn. 562, 566, 93 N.W.2d 547, 550 (1958); In re Estate of Witzon, 223 Minn. 409, 413, 27 N.W.2d 429, 431-32 (1947). The city argues, however, that these general rules have a notable exception where the non-appealing parties' rights are intertwined with those of the appealing party, or where necessary to provide the appellant with full and effective relief.

Minnesota caselaw specifically addressing exceptions to the general non-relief rule is decidedly limited. This court has held that the exception applies only to circumstances where "the ruling on appeal would place the nonappealing parties in a position worse than before the appeal," such as cases involving jointly liable defendants. Poured Concrete Founds., Inc. v. Andron, Inc., 507 N.W.2d 888, 892 (Minn.App.1993), review denied (Minn. Jan. 27, 1994). We noted that non-appealing parties should "receive the benefit only if their interests are so intertwined that they are harmed by the result on appeal." Id. at 892-93.

The city urges us to focus on the "intertwined interests" of the different executive agencies, and the overall harm that would result from allowing one agency to retain public records, while preventing another from doing so. It encourages this court to find guidance in Ex parte Elliot, 815 S.W.2d 251 (Tex.1991), a case decided by the Texas Supreme Court under similar circumstances. In Elliot, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

676 N.W.2d 337                                                      Page 8
(Cite as: 676 N.W.2d 337)

district attorney appealed a trial court's expunge-
ment of all petitioner's criminal records. 815
S.W.2d at 251. The Texas Court of Appeals sus-
tained the district attorney's point of error, but lim-
ited its reformation of the trial court order to re-
cords maintained by him. Id. The Texas Supreme
Court reversed the limited reformation, finding that
the "law governing expunction of criminal records
creates a unique situation in which all persons and
agencies party to an expunction action share not
only interwoven but identical interests." Id. at 252.
As such, the court reasoned, reversal of the entire
district court order was warranted under the circum-
stances. Id.

Though Elliot has no precedential value in this jur-
isdiction, we are persuaded by its reasoning and its
underlying policy arguments. Expungement by
some, but not all agencies, would undermine the
"common goals of uniform management of docu-
mentation and effective deterrence of recidivism."
Id. Further, a limited reversal would not provide
full and effective relief for the appealing party, for
it would be "unable to cross-reference its criminal
records with those of other agencies." Id.

*345 When weighing these policy considerations
along with the unwarranted judicial intrusion into
executive-branch functions, reversal of the entire
decision seems justified. The United States Su-
preme Court has recognized an appellate court's
power to reverse a judgment in toto if the contrary
result would work an injustice. See Washington
Gas-Light Co. v. Lansden, 172 U.S. 534, 556, 19
S.Ct. 296, 304, 43 L.Ed. 543 (1899). Here, were
this court to reverse the district court's order solely
as it pertains to the city, it would "work an in-
justice" because it would be upholding the expun-
gement of some non-court records held by the exec-
utive branch. T.M.B. held that this "intrusion upon
the constitutional functions of the executive branch
... is impermissible under the separation of powers
doctrine." T.M.B., 590 N.W.2d at 812-13. As such,
the district court's order expunging all non-judicial
records held by executive agencies must be re-

versed in its entirety.

### DECISION

Because the district court has inherent authority
over all court records and agents of the court, its or-
der to expunge all court records pertaining to
Schultz's conviction will not be disturbed. But be-
cause the court's inherent authority to order expun-
gement is limited in cases not involving a petition-
er's constitutional rights, we reverse the portion of
the district court's order instructing the sealing of
non-judicial records maintained by the executive
branch. This reversal extends to both appealing and
non-appealing executive agencies.

Affirmed in part and reversed in part.

Minn.App.,2004.
State v. Schultz
676 N.W.2d 337

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1   Jeffrey S. Salisbury, CSB No. 112033
    LAW OFFICE OF JEFFREY S. SALISBURY
2   4725 Village Plaza Loop, Suite 200
    Eugene, Oregon 97401
3   Telephone: (541) 345-7007
    Facsimile:  (541) 342-5213
4   E-mail:     salisburylaw@comcast.net

5   Attorney for Petitioner

6                  IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
7                         FOR THE COUNTY OF CONTRA COSTA

8   In the Matter of :                        No.    N 1 1 - 0 4 5 7

9   EDWIN E. "MIKE" LICKISS,                  DECLARATION OF EDWIN E. "MIKE"
                                              LICKISS, JR., IN SUPPORT OF PETITION
10                       Petitioner,          TO EXPUNGE FINRA CRD RECORD

11  And of :

12  FINANCIAL INDUSTRY REGULATORY
    AUTHORITY, INC.,
13

14                       Interested Party.             BY FAX

15

16          I, Edwin E. "Mike" Lickiss, Jr., declare as follows:

17

18          1. I am the Petitioner in this matter and make this declaration on personal knowledge in

19  support of my Petition for Expungement submitted herewith. I could and would testify competently to

20  the facts contained in this Declaration if called to do so.

21          2. I attended college at California State University at Hayward, where I earned a Bachelors of

22  Arts degree in history/political science in 1970. I subsequently obtained a Masters of Arts degree in

23  deaf education from California State University at San Francisco.

24          3. Upon graduating from college, I became a teacher. I taught deaf children at the California

25  School for the Deaf in Berkeley for one year in 1971. After that, I taught deaf students in the Mount

26  Diablo Unified School District for three years from 1972 through 1976.

27          4. I began my career as a financial advisor in October of 1977, when I sat for and passed the

28
                      DECLARATION OF EDWIN E. "MIKE" LICKISS, JR., IN SUPPORT
                      OF PETITION TO EXPUNGE FINRA CRD RECORD, PAGE 1

                      104M37092311941M - 3/18/2011 3:35:00 PM

1  exam administered by the National Association of Securities Dealers ("NASD") for its Series 1

2  limited securities sales license. This license authorized me to sell mutual funds and limited

3  partnership investment securities.

4      5. A true and correct copy of my current Financial Regulatory Authority ("FINRA")

5  BrokerCheck CRD report (the "CRD Report") is attached to this declaration as Exhibit "A". The

6

7  CRD Report is maintained and published by FINRA, the self-governing regulatory body that oversees

8  the conduct of securities brokers and brokerage firms. FINRA replaced the NASD in mid 2007 when

9  the NASD and NYSE regulatory bodies were merged and renamed.

10     6. I took and passed the NASD Series 7 exam and obtained this general securities sales license

11  in November of 1985. Ex. "A" at 3. The Series 7 license authorized me to sell stocks, bonds and real

12  estate investment trusts ("REITs"), among other securities.

13     7. I was a full-time financial advisor from my initial licensing in 1977 through 1991. Ex. "A"

14  at 3. During that timeframe, I associated with several brokerage firms, as follows: Putnam Fund

15  Distributors, Inc., University Securities Corporation, Financial Network Investment Corporation and

16  Linsco/Private Ledger Corp. *Id.*

17

18     8. At no time during my fourteen years with those firms, through 1991, was I involved in a

19  customer or regulatory complaint. Likewise there were no lawsuits or arbitrations filed against me

20  until then. I have never been accused, let alone convicted, of any criminal wrongdoing. Thus my

21  record was spotless throughout that entire timeframe.

22     9. In or about 1986 I became aware of a company called Commonwealth Equity Trust

23  ("CET"). This company was structured as a REIT, meaning it issued stock to investors and was

24  required by law to pass through 95% of its net income to them in the form of dividends. CET was

25  founded in 1973 and was managed by Jeff Berger, Sr., ("Jeff Sr."), who followed a conservative

26  business approach to running the REIT and protecting its shareholders.

27     10. CET owned and operated various types of income producing real estate within the State of

28

DECLARATION OF EDWIN E. "MIKE" LICKISS, JR., IN SUPPORT<br/>OF PETITION TO EXPUNGE FINRA CRD RECORD, PAGE 2

1    California, including apartment complexes, retail centers, and office buildings. Reflecting Jeff Sr's.

2    prudent investment management philosophy, CET borrowed little or no money to acquire or operate

3    its properties, which meant it was able to pay shareholder dividends on the vast majority of its

4    operating income.

5
        11. CET's modest borrowings also contributed to it being a relatively conservative
6
     investment. The cash flow break-even point of its properties was much lower than would have been
7
     the case had the properties had been encumbered with substantial debt.
8

9        12. From approximately 1977 though 1991, CET's conservative orientation resulted in strong

10   financial performance which was reflected in the form of stable share prices and dividend payments.

11   The REIT paid consecutive quarterly dividends of approximately 8% throughout this timeframe. The

12   share price of the stock remained constant at about $10 per share, eventually increasing to roughly $12

13   over time.

14
        13. Based on all of this, as well as on my brokerage firms' investigative due diligence into the
15
     background of CET management and the legitimacy of its business, I began selling CET stock to a
16
     number of my clients in or around 1987. I continued selling CET through approximately early 1991.
17
     I felt comfortable doing so because of CET stock's steady share prices and dividend payments which
18
     had been sustained for many years.
19

20       14. I stopped selling CET when I began to grow concerned about its rising level of debt. See

21   true and correct copies of CET's 1994 SEC Form 10-K (annual report) excerpts at 7-8, Exhibit "B"

22   hereto. As noted, CET previously had not borrowed much if any money to buy or operate its

23   properties. However this started to change when Jeff Sr. died in or around 1989 and his son, Jeffrey

24   Berger, Jr., ("Jeff Jr.") took over for him.

25
        15. At the same time CET's debt level was increasing, the California economy and real estate
26
     market began to decline. Both of these problems came together and intensified in 1990 and 1991. Ex.
27
     "B" at 3-4, 7-8.
28

DECLARATION OF EDWIN E. "MIKE" LICKISS, JR., IN SUPPORT
OF PETITION TO EXPUNGE FINRA CRD RECORD, PAGE 3

16. Unbeknownst to me, Jeff Jr.'s. company, B&B Property Investment, Development and Management Company, Inc. ("B&B") extracted a $7.2 million in cash prepaid real estate commissions from CET in or about 1990. Ex. "B" at 4, 31. This payment drained crucial liquidity from CET and made its financial position all the weaker as California's economy entered recession and its commercial real estate market declined in 1990 and 1991. *Id.* at 3.

17. As a result of all of this, CET cut its dividend in early 1991. Ex. "B" at 12. Almost immediately its share price plummeted, and the stock became illiquid. CET defaulted on its lines of credit and other loans, wrote-down the value of its properties, and negotiated restructuring agreements with its lender, on which it later defaulted. *Id.* at 2.

18. Class action – and other – lawsuits were filed against B&B, among others, alleging that Jeff Jr.'s B&B $7.2 million compensation payment was unearned – because it related to hoped-for future sales commissions on CET property sales that had not yet taken place – and therefore constituted a breach of fiduciary duty owed to CET's shareholders. Ex. "B" at 9. The class case was eventually settled for approximately $1 million, and Jeff Jr. was ousted from the company. *Id.* at 4, 9, 49

19. There were many efforts to salvage CET, though none proved successful. Unfortunately, the company declared bankruptcy in 1993. Its stock traded for pennies on the dollar thereafter, causing CET investors, including mine, to lose the great majority of their investment. Ex. "B" at 2.

20. During 1991 through 1996, clients of mine brought seventeen FINRA arbitrations against me, most all of which centered on my sale to them of CET stock. A true and correct summary of the blemishes on my CRD Report, which is virtually all comprised of CET related matters, is attached hereto as Exhibit "C". Those few matters in which CET sales are not indicated may well have involved CET, however I am unable to remember such given the passage of time.

21. All of the CET claims themselves relate to my sales of its stock, which I stopped selling approximately twenty long years ago. The essence of all of the allegations was that the investments

1   were unsuitable for the clients and that I failed to disclose the risks of the stock to them. There were

2   no allegations of misappropriation or that I derived any personal benefit from selling the stock other

3   than a standard sales commission.

4
5   22.  Contrary to the arbitration claims, and as explained above, the CET stock was in fact a

6   conservative investment until the company was taken over by Jeff, Jr., at which time it changed by

7   taking on excessive debt and by Jeff, Jr. misappropriating over $7 million in cash from CET, all when

8   the real estate economy was sinking, causing CET's insolvency and failure.

9   23.  In at least twelve of the seventeen arbitration claims, the investors were represented by a

10  former stockbroker named Richard L. Sacks. A true and correct copy of Mr. Sacks' CRD Report is

11  attached hereto as Exhibit "D".

12  24.  Mr. Sacks was not, and never has been an attorney. He ran an "investor recovery" service

13  in the San Francisco Bay Area during the early to mid 1990s. He apparently felt that he did not need a

14  license to practice law because he brought his claims through FINRA arbitration.

15  25.  Mr. Sacks has a deeply checkered moral and ethical regulatory history. On January 30,

16  1991, he was $100,000 by FINRA and barred from representing any FINRA member firm for five

17
18  years. Ex. "D" at 14.  Other fines and censures followed, and his broker representation of FINRA

19  member firms was revoked on March 16, 1991. Id.

20  26.  On August 9, 1993, he was fined $159,956.43 by regulators. Ex. "D" at 8.  He was also

21  censured and fined for $219,361.20 and barred from membership in NASD. Id. at 12.

22  27.  Having been extensively sanctioned and dismissed from the securities business, Mr. Sacks

23  determined to make his living thereafter by suing brokers in arbitration, and I became one of his

24  biggest targets. He obtained the CET shareholder list and contacted the great majority of clients to

25  whom I had sold CET stock. The purpose of his calls was to rile them up to gain them as his clients to

26  sue me in FINRA arbitration and thereby earn large percentage-of-recovery fees from such

27  representation.

28

DECLARATION OF EDWIN F. "MIKE" LICKISS, JR., IN SUPPORT
OF PETITION TO EXPUNGE FINRA CRD RECORD, PAGE 5

1    28.  Absent Mr. Sacks' unethical and likely illegal solicitation of my clients, I am convinced

2    that few, if any, of them would have filed arbitrations against me.

3    29.  Separate from CBT, the only other blemish on my CRD report relates to a client settlement

4    I made. A client of mine sustained a loss on a promissory note investment sold to him by my former

5    partner, not by me. After the investment failed, I agreed to reimburse the client for his loss, though I

6    did so without first obtaining the consent of my broker-dealer, Linsco/Private Ledger, Inc. As

7    reflected in my CRD Record, I made the agreement under intense personal pressure out of a sense of

8    decency: "The client was believed to be on his deathbed and he and his family begged me to buy back

9    his investment that was in financial trouble. Which I agreed to before conferring with my broker

10   dealer." Ex. "A" at 43.

11

12   30.  The client later complained to FINRA, which investigated this occurrence.  I settled with

13   FINRA for payment to it of a monetary sanction in the amount of $8,500.00. Ex. "A" at 7-8.

14   Linsco/Private Ledger thereafter permitted me to resign from the firm. *Id.* at 43.

15   31.  This investment settlement reimbursement incident occurred more than 15, years ago, in

16   mid 1995. Notably I did what I felt was the honorable thing in returning and restoring the entire loss

17   sustained by the client the subject investment.

18

19   32.  Since the pocket of issues surrounding my sale of CET, some 20 years ago, and the

20   isolated client settlement issue 15 years ago, my CRD Record has remained perfectly clean, just as it

21   did for the approximately ten years leading up to the first CET claim in 1991.

22   33.  Despite my professional record remaining clean for so long, I have continued to suffer

23   substantial professional and financial hardship relating to my sale of CET stock. My current and

24   potential new clients increasingly turn to the Internet and check out my BrokerCheck history on

25   FINRA's website. When they do that, they download my CRD Report and are stunned to see

26   seventeen arbitrations against me.

27

28   34.  It is very difficult to try to explain to them all of the circumstances set forth in this

DECLARATION OF EDWIN E. "MIKE" LICKISS, JR., IN SUPPORT
OF PETITION TO EXPUNGE FINRA CRD RECORD, PAGE 6

1    Declaration and in the attached Exhibits. Most potential new clients become skeptical and unwilling

2    to listen to my explanation of the 20 years that have passed since the CET sales, or of REIT's demise

3    due to Jeff, Jr.'s misappropriation, or of Mr. Seck's instigation of the supermajority of the arbitrations

4    and his checkered past.

5        35. As a result, I have lost existing clients and several potential new clients. I reasonably

6    estimate these lost clients to have caused me a decrease in personal income measured in the tens of

7
     thousands of dollars.
8

9        36. In addition to the monetary losses, I have also suffered a considerable blow to my

10   reputation within the East Bay community in which I live and work. For example, in or about 2005, a

11   family member's school class looked-up my FINRA CRD record and saw all seventeen of the FINRA

12   arbitrations. This was very embarrassing to the child and to me, and it has diminished my reputation

13   amongst my fellow members of our community.

14       I declare under penalty of perjury under the laws of the State of California that the foregoing is

15   true and correct to the best of my knowledge and belief and that I make this declaration at

16   _Alamo_____, California on _December 6_, 2010.

17

18

19                    Edwin E. "Mike" Lickiss, Jr.

20

21

22

23

24

25

26

27

28

DECLARATION OF EDWIN E. "MIKE" LICKISS, JR., IN SUPPORT
OF PETITION TO EXPUNGE FINRA CRD RECORD, PAGE 7



FINCa

EXHIBIT "A"

**BrokerCheck Report**

**EDWIN EMMETT LICKISS JR**

CRD# 844969

Report #56678-76943, data current as of Tuesday, June 01, 2010.

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 4 |
| Disclosure of Customer Disputes, Disciplinary, and Regulatory Events | 5 - 43 |
| About this BrokerCheck Report | 44 |



**Dear Investor:**

FINRA has generated the following BrokerCheck report for EDWIN E. LICKISS, JR. The information contained within this report has been provided by a FINRA member firm(s) and securities regulators as part of the securities industry's registration and licensing process and represents the most current information reported to the Central Registration Depository (CRD₂) system.

FINRA regulates the securities markets for the ultimate benefit and protection of the investor. FINRA believes the general public should have access to information that will help them determine whether to conduct, or continue to conduct, business with a FINRA member firm or any of the member's associated persons. To that end, FINRA has adopted a public disclosure policy to make certain types of information available to you. Examples of information FINRA provides on currently registered individuals and individuals who were registered during the past two years include: actions by regulators, investment-related civil suits, customer disputes that contain allegations of sales practice violations against brokers, all felony charges and convictions, misdemeanor charges and convictions relating to securities violations, and financial events such as bankruptcies, compromises with creditors, judgments, and liens. FINRA also provides certain information on individuals whose registrations terminated more than two years ago.

When evaluating this report, please keep in mind that it may include items that involve pending actions or allegations that may be contested and have not been resolved or proven. Such items may, in the end, be withdrawn or dismissed, or resolved in favor of the firm or broker, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

The information in this report is not the only resource

104M370923119.III - 3/18/2011 3:35:08 PM

you should consult. FINRA recommends that you learn as much as possible about the individual broker or brokerage firm from other sources, such as professional references, local consumer and investment groups, or friends and family members who already have established investment business relationships.

FINRA BrokerCheck is governed by federal law, Securities and Exchange Commission (SEC) regulations and FINRA rules approved by the SEC. State disclosure programs are governed by state law, and may provide additional information on brokers and firms licensed by the state. Therefore, you should also consider requesting information from your state securities regulator. Refer to www.nasaa.org for a complete list of state securities regulators.

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at
brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.



www.finra.org/brokercheck

User Guidance



FINRA

# Report Summary for this Broker

The report summary provides an overview of the broker's professional background and conduct. The individual broker, a FINRA-registered firm(s), and/or securities regulator(s) have provided the information contained in this report as part of the securities industry's registration and licensing process. The information contained in this report was last updated by the broker, a previous employing brokerage firm, or a securities regulator on 11/18/2009.

Currently employed by and registered with the following FINRA Firm:

INVESTMENT ARCHITECTS, INC.
3201 DANVILLE BLVD. #300
ALAMO, CA 94507
CRD# 17774
Registered with this firm since 08/28/1998

## Broker Qualifications

This broker is registered with:

* 1 Self-Regulatory Organization

* 7 U.S. states and territories

This broker has passed:

* 1 Principal/Supervisory Exam

* 2 General Industry/Product Exams

* 1 State Securities Law Exam

## Registration and Employment History

This broker was previously registered with the following FINRA member firms:

FINANCIAL TELESIS INC
CRD# 31012
SAN RAFAEL, CA
09/1995 - 08/1998

LINSCO/PRIVATE LEDGER CORP.
CRD# 5413
BOSTON, MA
12/1989 - 07/1995

LINSCO FINANCIAL GROUP, INC.
CRD# 524
03/1987 - 12/1989

For additional registration and employment history details as reported by the individual broker, refer to the Registration and Employment History section of this report.

## Disclosure of Customer Disputes, Disciplinary, and Regulatory Events

This section includes details regarding disclosure events reported by or about this broker to CRD as part of the securities industry registration and licensing process. Examples of such disclosure events include formal investigations and disciplinary actions initiated by regulators, customer disputes, certain criminal charges and/or convictions, as well as financial disclosures, such as bankruptcies and unpaid judgments or liens.



The following types of disclosures were reported:

Customer Dispute

©2010 FINRA. All rights reserved. Report# 05678-75943 about EDWIN E. LICKISS JR. Data current as of Tuesday, June 01, 2010.

104M370923119.if - 3/18/2011 3:35:00 PM

www.finra.org/brokercheck



# Broker Qualifications

## Registrations

This section provides the self-regulatory organizations (SROs), states and U.S. territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration became effective. This section also provides the physical location of each branch that the individual broker is associated with for each listed employment.

This individual is currently registered with 1 SRO and is licensed in 7 U.S. states and territories through his or her employer.

## Employment 1 of 1

Firm Name:          INVESTMENT ARCHITECTS, INC.

Main Office Address:  34 PETALUMA BLVD NORTH
                     PETALUMA, CA 94952-3079

Firm CRD#:          17774

| SRO | Category | Status | Date |
|-----|----------|--------|------|
| FINRA | | | |

| U.S. State/ Territory | Category | Status | Date |
|-----------------------|----------|--------|------|
| California | Agent | APPROVED | |
| Idaho | Agent | APPROVED | |
| Oregon | Agent | APPROVED | |

## Branch Office Locations

INVESTMENT ARCHITECTS, INC.
3201 DANVILLE BLVD. #200
ALAMO, CA 94507

104M370923119.bf - 3/18/2011 3:35:08 PM

©2010 FINRA. All rights reserved.   Report# 65578-76903 about EDWIN E. LICASSI Jr., Data current as of Tuesday, June 24, 2010.



FINRA

www.finra.org/brokercheck

# Broker Qualifications

## Industry Exams this Broker has Passed

This individual has passed 1 principal/supervisory exam, 2 general industry/product exams, and 1 state securities law exam.

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
|      |          |      |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| General Securities Representative Examination | | |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
|      |          |      |

104M4370923119.RT - 3/10/2011 3:35:08 PM

©2010 FINRA. All rights reserved.   Report#6-608378-705443 about EDWIN E. LICKISS JR. Data current as of Tuesday, June 01, 2010.



www.finra.org/brokercheck

User Guidance

## Registration and Employment History

### Previously Registered with the Following FINRA Firms

FINRA records show the broker previously held FINRA registrations with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
| --- | --- | --- | --- |
| 12/1993 - 07/1995 | LINSCO/PRIVATE LEDGER CORP | 5419? | BOSTON, MA |
| 07/1983 - 12/1987 | FINANCIAL NETWORK INVESTMENT CORPORATION | 1387? | |
| 11/1977 - 07/1978 | PLIMPTON FUTURES DIVISION ... | | |

### Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

Please note that the broker is required to provide this information only while registered with a FINRA firm and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.

| Employment Dates | Employer Name | Employer Location |
| --- | --- | --- |
| 08/1991 - Present | SELF-INSURANCE SALES | |

### Affiliations

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

No information available.

104M370923119.6f - 3/18/2011 3:35:09 PM

©2010 FINRA. All rights reserved.   Report# 080?9-75?43 about EDWARD E. LICKISS JR. Data current as of Tuesday, June 01, 2010.

Filledxxx

03/18/2011  15:08   5413425211          LAW OFFICE OF JSS          PAGE  16/0

FINRA

User Guidance

www.finra.org/brokercheck

(Note: brokers may choose to settle customer disputes or regulatory matters for business or other reasons)

• Customer disputes also may be resolved without any payment to the customer or any finding of wrongdoing on the part of the individual broker.

| | Pending | Final | On Appeal |
|---|---|---|---|
| Customer Dispute | | | |

104M370923119.tif - 3/18/2011 3:35:08 PM

©2010 FINRA. All rights reserved. Report# 66879-75843 about EDWIN E. LICKISS JR. Data current as of Tuesday, June 01, 2010.

www.finra.org/brokercheck

User Guidance

finra

## Disclosure Event Details

When evaluating this information, please keep in mind that a number of items may involve pending actions or allegations that may be contested and have not been resolved or proven. The items may, in the end, be withdrawn or dismissed, or resolved in favor of the individual broker, or concluded through a negotiated settlement for certain business reasons (e.g., to maintain customer relationships or to limit the litigation costs associated with disputing the allegations) with no admission of finding of wrongdoing.

This report provides the information exactly as it was reported to CRD by the individual broker, a member firm(s), and/or by securities industry regulators. Some of the specific data fields contained in the report may be blank if the information was not provided to CRD.

### Regulatory - Final

This section provides information regarding a final, regulatory action that was reported to CRD by the individual broker, a member firm, and/or a securities regulator. The event may include a final, formal proceeding initiated by a regulatory authority (e.g., a state securities agency, a self-regulatory organization, a federal regulator such as the SEC or the Commodities Futures Trading Commission (CFTC), or a foreign financial regulatory body) for a violation of investment-related rules or regulations. This section may also include a revocation or suspension of a broker's authority to act as an attorney, accountant or federal contractor.

| | |
|---|---|
| **Reporting Source:** | Regulator |
| **Regulatory Action Initiated By:** | NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. |
| **Sanction(s) Sought:** | |
| **Other Sanction(s) Sought:** | |
| **Date Initiated:** | 10/14/1995 |
| **Docket/Case Number:** | C01960023 |
| **Employing firm when activity occurred which led to the regulatory action:** | |
| **Product Type:** | Other |
| **Other Product Type(s):** | |
| **Allegations:** | COMPLAINT NO. C01960023 FILED OCTOBER 14, 1996 BY DISTRICT NO. 1 AGAINST EDWIN EMMETT LICKISS, JR. ALLEGING VIOLATIONS OF NASD RULES 2110 AND 3040 (FORMERLY ARTICLE III, SECTIONS 1 AND 40 OF THE RULES OF FAIR PRACTICE) IN THAT RESPONDENT LICKISS |

©2010 FINRA. All rights reserved.  Report# 08070-76043 about EDWIN E LICKISS in Documents in of Tuesday, June 01, 2010.

104M370923119.0f - 3/18/2011 3:35:08 PM

03/18/2011  15:00  5413425?█                 LAW OFFICE OF JSS █                              PAGE  18/8·

www.finra.org/brokercheck

User Guidance

FINPA

PARTICIPATED IN PRIVATE SECURITIES TRANSACTIONS WITHOUT PROVIDING PRIOR WRITTEN NOTIFICATION TO HIS MEMBER FIRM; EFFECTED A SETTLEMENT WITH A PUBLIC CUSTOMER CONCERNING HIS PREVIOUS INVESTMENT WITHOUT THE KNOWLEDGE OR APPROVAL OF HIS MEMBER FIRM; AND, EXECUTED SETTLEMENT AGREEMENT WITH PUBLIC CUSTOMERS WITHOUT THE KNOWLEDGE OR APPROVAL OF HIS MEMBER FIRM.

**Current Status:** Final

**Resolution:** Decision & Order of Offer of Settlement

**Resolution Date:** 08/19/1997

**Sanctions Ordered:** Censure
Monetary/Fine $8,500.00

**Other Sanctions Ordered:**

**Sanction Details:** ON AUGUST 19, 1997, THE DECISION AND ORDER OF ACCEPTANCE OF OFFER OF SETTLEMENT SUBMITTED BY RESPONDENT LICKISS WAS ACCEPTED; THEREFORE, HE IS CENSURED AND FINED $8,500.

\*\*\*\*\*\*\* $8,500 FULLY PAID AS OF 3/4/98, INVOICE NO. 97-01-744
\*\*\*

---------------------------------------------------------------

**Reporting Source:** Broker

**Regulatory Action Initiated By:** NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

**Sanction(s) Sought:** Censure

**Other Sanction(s) Sought:** FINE

**Date Initiated:** 08/19/1997

**Docket/Case Number:** C01960023

**Employing firm when activity occurred which led to the regulatory action:** LINSCO PRIVATE LEDGER CORPORATION

**Product Type:** No Product

**Other Product Type(s):**

**Allegations:** THE COMPLAINT ALLEGES THAT ON OUR ABOUT 11/20/1993 MR. LICKISS

©2010 FINRA. All rights reserved.    Report# 657G-759AS about EFAINE E. LICKISS JR. Data current as of Tuesday, June 01, 2010.

10444370923119.█ - 3/18/2011 3:35:08 PM



www.finra.org/brokercheck

Usa Guidance

PARTICIPATED IN THE PURCHASE OF A $10,000 NOTE ISSUED BY DANVILLE FINANCIAL GROUP TO CUSTOMER JM'S IRA ACCOUNT WITHOUT PROVIDING PRIOR WRITTEN NOTICE TO LPL, HE THEN EFFECTED A SETTLEMENT WITH JM WITHOUT LPL'S APPROVAL, AND SETTLED WITH OTHER CLIENTS WITHOUT LPL'S APPROVAL.

**Current Status:**  Final

**Resolution:**  Acceptance, Waiver & Consent(AWC)

**Resolution Date:**  08/21/1997

**Sanctions Ordered:**  Censure
Monetary/Fine $8,500.00

**Other Sanctions Ordered:**

**Sanction Details:**  FINE PAID IN FULL

184M370923119.tif - 3/18/2011 3:35:08 PM

©2010 FINRA. All rights reserved. Report 66678-55145 about Edward E. LICKISS-RI. Data correct as of Tuesday, June 01, 2010.

www.finra.org/brokercheck



User Guidance

FINRA

**Customer Dispute - Award / Judgment**

This section provides information regarding a final, customer dispute that was reported to CRD by the individual broker, a member firm, and/or a securities regulator. The event may include a final, consumer-related, investment-related arbitration proceeding or civil suit that contains allegations of sales practice violations against the individual broker and resulted in an award to the customer(s), a decision for the customer(s), or a judgment (other than monetary) to the customer(s). Note: An arbitration may contain more than one request or award for a certain Relief Type (e.g., Actual/Compensatory Damages) to one or more claimants.

| | |
|---|---|
| **Reporting Source:** | Regulator |
| **Employing firm when activities occurred which led to the complaint:** | LINSCO/PRIVATE LEDGER CORP. |
| **Allegations:** | ACCOUNT RELATED-NEGLIGENCE; MISREPRESENTATION; BREACH OF FIDUCIARY DUTY, CHURNING |
| **Product Type:** | |
| **Alleged Damages:** | $200,000.00 |

**Arbitration Information**

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD - CASE #91-03204 |
| **Date Notice/Process Served:** | 10/28/1991 |
| **Arbitration Pending?** | No |
| **Disposition:** | Other |
| **Disposition Date:** | 10/07/1992 |
| **Disposition Detail:** | AWARD AGAINST PARTY ACTUAL/COMPENSATORY DAMAGES, RELIEF HAS BEEN AWARDED (PARTIAL OR FULL), AWARD AMOUNT $94,768.00 JOINTLY AND SEVERALLY |

-------------------------------------------------------------

| | |
|---|---|
| **Reporting Source:** | Broker |
| **Employing firm when activities occurred which led to the complaint:** | LINSCO/PRIVATE LEDGER CORP. |
| **Allegations:** | VIOLATION OF FEDERAL AND CALIFORNIA SECURITIES LAWS, FRAUD, NEGLIGENCE, NEGLIGENT |

©2010 FINRA. All rights reserved.   Report# 35578-75843 about EDWIN E. LEXISS SR. Data current as of Tuesday, June 01, 2010.

19

**Product Type:** MISREPRESENTATION, BREACH OF FIDUCIARY DUTY, BREACH OF WARRANTY, EMOTIONAL DISTRESS.

**Alleged Damages:** Direct Investment(s) - DPP & LP Interest(s)

$200,000.00

**Customer Complaint Information**

**Date Complaint Received:** 10/11/1991

**Complaint Pending?** No

**Status:** Arbitration/Reparation

**Status Date:** 10/11/1991

**Settlement Amount:**

**Individual Contribution Amount:**

**Arbitration Information**

**Arbitration/Reparation Claim filed with rand Docket/Case No.:** NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. - 91-03204

**Date Notice/Process Served:** 10/28/1991

**Arbitration Pending?** No

**Disposition:** Award to Customer

**Disposition Date:** 10/07/1992

**Monetary Compensation Amount:** $94,768.00

**Individual Contribution Amount:** $0.00

**Summary:** SETTLEMENT $93,768
THE BASIS OF THIS LITIGATION AND/OR COMPLAINT
REALLY STEMS FROM OUR NATIONAL DECLINE IN REAL ESTATE VALUES.
OUR CORRESPONDING RECESSION HAS LED MANY A PARTNERSHIP TO
EITHER REDUCE CASH FLOWS OR SUSPEND OPERATIONS. WE MAINTAIN
THAT THE INVESTMENTS WERE SUITABLE, THAT THEY HAD GOOD
PERFORMANCE HISTORIES AND EVERY REASONABLE EXPECTATION FOR
SUCCESS. EACH PORTFOLIO WAS ADEQUATELY DIVERSIFIED AND HAD
STRONG LIQUID POSITIONS. FINALLY, THE CLIENT WAS PROPERLY
INFORMED OF RISK AND WE BELIEVE SOUGHT THIS ACTION TO CREATE
LIQUIDITY.

www.finra.org/brokercheck

User Guidance

FINRA

**Reporting Source:** Regulator

**Employing firm when activities occurred which led to the complaint:** DANVILLE FINANCIAL GROUP, INC.

**Allegations:** SUITABILITY; MISREPRESENTATION; OMISSION OF FACTS; ACCOUNT RELATED - FAILURE TO SUPERVISE

**Product Type:**

**Alleged Damages:** $53,675.00

**Arbitration Information**

**Arbitration/Reparation Claim filed with and Docket/Case No.:** NASD - CASE #91-03118

**Date Notice/Process Served:** 10/25/1991

**Arbitration Pending?** No

**Disposition:** Other

**Disposition Date:** 10/27/1992

**Disposition Detail:** AWARD AGAINST PARTY
ACTUAL/COMPENSATORY DAMAGES, RELIEF HAS
BEEN AWARDED (PARTIAL OR FULL), AWARD AMOUNT $45,224.00 JOINTLY
AND SEVERALLY

--------------------------------------------------------------------

**Reporting Source:** Broker

**Employing firm when activities occurred which led to the complaint:** DANVILLE FINANCIAL GROUP, INC.

**Allegations:** VIOLATION OF FEDERAL AND CALIFORNIA
SECURITIES LAWS, FRAUD, NEGLIGENT MISREPRESENTATION,
NEGLIGENCE, BREACH OF FIDUCIARY DUTY, BREACH OF WARRANTY,
EMOTIONAL DISTRESS.

**Product Type:** Direct Investment(s) - DPP & LP Interest(s)

**Alleged Damages:** $63,675.00

©2010 FINRA. All rights reserved.   Report# 66878-75043 about EDWIN E. LICROSS,JR. Data current as of Tuesday, June 01, 2010.

www.finra.org/brokercheck

Final

13

## Customer Complaint Information

**Date Complaint Received:** 10/25/1991

**Complaint Pending?** No

**Status:** Arbitration/Reparation

**Status Date:** 10/27/1992

**Settlement Amount:**

**Individual Contribution Amount:**

### Arbitration Information

**Arbitration/Reparation Claim filed with and Docket/Case No.:** NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.: 91-03118

**Date Notice/Process Served:** 10/25/1991

**Arbitration Pending?** No

**Disposition:** Award to Customer

**Disposition Date:** 10/27/1992

**Monetary Compensation Amount:** $45,224.00

**Individual Contribution Amount:** $0.00

**Summary:** $45,224 AWARDED
THE BASIS OF THIS LITIGATION AND/OR COMPLAINT
REALLY STEMS FROM OUR NATIONAL DECLINE IN REAL ESTATE VALUES.
THE CORRESPONDING RECESSION LED MANY A PARTNERSHIP TO
EITHER
REDUCE CASH FLOWS OR SUSPEND OPERATIONS. WE MAINTAIN THAT
THE
INVESTMENTS WERE SUITABLE, THAT THEY HAD GOOD PERFORMANCE
HISTORIES AND EVERY REASONABLE EXPECTATION FOR SUCCESS. EACH
PORTFOLIO WAS ADEQUATELY DIVERSIFIED AND HAD STRONG LIQUID
POSITIONS. FINALLY, THE CLIENT WAS PROPERLY INFORMATED OF RISK
AND WE BELIEVE SOUGHT THIS ACTION TO CREATE LIQUIDITY.

104M370923119.lif - 3/18/2011 3:35:08 PM

©2010 FINRA. All rights reserved.     Report# 66878-75943 about DIANNE L HICKS LB. Date current as of Tuesday, June 04, 2010a.